**In re NEW CENTURY.**

**No. CV 07–00931 DDP (JTLx).**

United States District Court,
C.D. California.

Dec. 3, 2008.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND DENYING MOTION TO STRIKE

DEAN D. PREGERSON, District Judge.

This is a securities class action that arises in the wake of the sub-prime mort-

gage lending crisis and the collapse of one of the industry's formerly largest sub-prime mortgage lenders, New Century Financial Corporation ("New Century"). Lead Plaintiff New York State Teachers Retirement System ("NYSTRS") brings this action on behalf of all persons and entities, other than Defendants, who purchased or acquired New Century common stock, New Century Series A Cumulative Redeemable Preferred Stock ("Series A Stock"), New Century Series B Cumulative Redeemable Preferred Stock ("Series B Stock"), and/or New Century call options, or who sold New Century put options, between May 5, 2005 and March 13, 2007 (the "Class Period"). (Compl.¶ 1.) Defendants are New Century officers ("Officer Defendants"), its directors ("Director Defendants"), its auditor KPMG ("KPMG"), and the underwriters of the stock offering ("Underwriter Defendants").

Sub-prime lending involves originating and purchasing loans for borrowers considered high-risk by traditional credit and underwriting standards. (Compl.¶ 2.) The recent sub-prime mortgage lending crisis has caused many mortgage lending companies—and the value of their stocks—to collapse. New Century became one of the nation's largest mortgage finance companies by focusing on sub-prime lending. (Compl.¶ 2.) In 1996, when New Century was formed, it had $357 million in total loan originations and purchases. For the year-ended December 31, 2005, New Century reported $56.1 billion in total loan originations and purchases. (Compl.¶¶ 55–60.) Sub-prime loans accounted for $32.8 billion, or 62.2% of total loans financed or sold. (Compl.¶ 65.)

In June 2005 and August 2006, New Century made offerings of the Series A stock and Series B stock respectively. On February 7, 2007, a day before 2006 fourth-quarter and year-end results were scheduled to be released, New Century issued a press release that disclosed a restatement of earnings for the previous three quarters of 2006. New Century stated that material weaknesses in internal controls over financial reporting caused the reporting errors. (Compl.¶ 457.) Upon this announcement, New Century stock plummeted by 36% the following day. (Id. at ¶ 459) In the period subsequent to these and additional disclosures, (Id. at ¶¶ 464, 468–476), New Century stock further declined. On March 14, 2007, New Century stock closed at $ 0.67 per share, a 97% decline from the over $30 per share prior to the disclosures. (Id. at ¶ 9) The Series A and Series B stock likewise fell by 75% during this period. (Id. at ¶¶ 9, 478.)

Plaintiffs filed this lawsuit alleging securities violations in connection with New Century's Series A and Series B stock. Plaintiffs maintain that these declines were foreseeable, and that Defendants made numerous material misstatements regarding New Century's financial situation and business operations. In summary, Plaintiffs allege that Defendants, during the Class Period, misrepresented New Century's ability to repurchase defaulted loans; overvalued its residual interests in securitizations; falsely certified the adequacy of its internal controls, loan origination standards, and the quality of its loans; and failed to identify these problems in public statements, registration documents, audits, or elsewhere. They claim that Defendants' material misrepresentations and omissions violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. They further claim that the New Century Officer Defendants and KPMG violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4(b), and Rule 10b–5 of the regulations promulgated by the Securities and Exchange Commission ("SEC").

On April 30, 2008, Plaintiffs filed their second amended consolidated class action complaint.[1] There are currently five motions to dismiss and one motion to strike before the Court. The Officer Defendants move to dismiss the securities fraud claims under section 10(b) and Rule 10b–5, as well as the derivative control person liability claims. Officer Defendant Robert Cole files his own motion to dismiss the same claims. The Director Defendants and Underwriter Defendants move to dismiss claims alleging violations of section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, in connection with the Series A and Series B stock. Those motions are joined by the Officer Defendants against whom Plaintiffs also allege violations of section 11 of the Securities Act. Defendant KPMG moves to dismiss the claim against it alleging violations of section 11 of the Securities Act in connection with Series B stock, and the securities fraud claim against it under section 10(b) and Rule 10b–5. Defendant KPMG also moves to strike all references in the Complaint to the Bankruptcy Report.

After reviewing the extensive briefing, hearing oral argument, and considering the arguments raised by all parties, the Court denies Defendants' motions to dismiss and denies Defendant KPMG's motion to strike.

## I. BACKGROUND

The Court's review on a motion to dismiss is generally limited to the allegations in the Complaint, taken as true and construed in the light most favorable to the non-moving party. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir.2000). The following background is derived from Plaintiffs' second amended complaint ("Complaint").

### A. *The Parties*

#### 1. *Plaintiffs*

Lead Plaintiff New York State Teachers Retirement System ("NYSTRS") has over 400,000 active members, retirees, and beneficiaries.[2] NYSTRS provides retirement, disability, and death benefits to eligible public school teachers in New York State. NYSTRS purchased New Century common stock during the Class Period and claims to have suffered damages due to the alleged wrongful conduct. (Compl.¶ 19.) Plaintiff Carl Larson acquired New Century Series A and B Preferred Stock during the Class Period and claims to have suffered damages due to the alleged wrongful conduct. (*Id.* at ¶ 20.) Plaintiff Charles Hooten sold New Century put options during the Class Period and claims to have suffered damages due to the alleged wrongful conduct. (*Id.* at ¶¶ 21.)

#### 2. *Defendants*

On April 2, 2007, New Century filed for Chapter 11 bankruptcy protection. For this reason, the action against New Century has been stayed. (Compl.¶ 22.) Plaintiffs assert claims against several other Defendants in this action. To be consistent, the Court follows the categorization from the Complaint: New Century Officer

---

1. Lead Plaintiff New York State Teachers' Retirement System originally filed its consolidated class action complaint on September 14, 2007. Defendants filed several motions to dismiss all or some of the claims alleged in Plaintiffs' complaint, and the Court granted the motions with leave for Plaintiffs to file an amended consolidated class action complaint. (Order Granting Motions to Dismiss With Leave to Amend, January 31, 2008.) The

Court's dismissal focused entirely on the organization of the complaint, and its difficulty in evaluating the basis for Plaintiffs' claims of securities law violations. The Court again addresses the organization of the complaint below.

2. On June 26, 2007, the Court appointed NYSTRS as Lead Plaintiff in this case.

Defendants, New Century Director Defendants, KPMG, and New Century Underwriters.

The Officer Defendants were corporate officers of New Century during the Class Period.[3] (Compl.¶¶ 23–26.) The officers' duties included disseminating prompt, accurate information about the Company's business, operations, financial statements and internal controls, and correcting any previously issued statements that had become materially untrue. They were involved in drafting, producing, reviewing, and/or disseminating the alleged material misstatements at issue in this case. (*Id.* at ¶¶ 27–29.)

The Director Defendants served as directors of New Century during the Class Period.[4] (Compl.¶¶ 30–38.) Each of the Director Defendants either signed the registration statements for Series A and Series B stock, or were directors when the stock was offered to the public. (*Id.*)

Defendant KPMG served as New Century's outside auditor during the Class Period. (Compl.¶ 39.) The Underwriter Defendants are the investment banks that acted as underwriters to the public offerings of New Century stock in June 2005.[5] (*Id.* at ¶¶ 40–47.)

B. *New Century's Mortgage Lending, Whole Loan Sales, and Securitizations*

New Century primarily originated sub-prime mortgage loans. Sub-prime lending refers to providing loans with typically high interest rates to high-risk borrowers, who may have poor credit histories, the lack of income documentation, or debt. The sub-prime mortgage lending industry collapsed, in part, because high-risk adjustable-rate interest-only loans, and "stated income" loans resulted in increased default rates among borrowers. (Compl.¶ 4.)

New Century's business was not limited to originating loans. New Century, like many sub-prime lenders, sought to sell its loans in a secondary market and recognize a "gain on sale" of those loans. New Century either made (1) whole loan sales; (2) securitizations structured as sales; or (3) securitizations structured as "financings." (Compl.¶ 61.) In whole loan sales, New Century realized gains upon sale of a pool of loans to third-parties. In securitizations structured as sales, New Century realized gains by selling a pool of loans to a trust, and receiving cash flows from its residual interests in the securitized pool of loans. In securitizations structured as financings, New Century did not record a gain on sale when it sold a pool of loans, but rather, received interest income as payments on the mortgages were made. (Compl.¶¶ 61–64.)

C. *New Century's Series A and Series B Preferred Stock Offerings*

In June 2005, New Century sold its Series A preferred stock, for net proceeds of approximately $109 million. The Un-

**3.** Robert K. Cole was Chairman of the Board of Directors ("Board"), Chief Executive Officer, and a Director of the Company. Brad A. Morrice was Vice Chairman of the Board and Company President. Edward F. Gotschall was Vice Chairman of Finance and a Director of the Company. Pattie M. Dodge was Executive Vice President, Chief Financial Officer and Investor Relations.

**4.** The Directors were Federic J. Forster, Michael M. Sachs, Harold A. Black, Donald E. Lange, Terrence P. Sandvik, Richard A. Zona, Marilyn A. Alexander, William J. Popejoy, and David Einhorn.

**5.** The Underwriter Defendants, all investment banks that acted as underwriters for various public offerings, are Bear, Stearns & Co. Inc; Piper Jaffray & Co.; Stifel, Nicolaus & Compan, Incorporated; JMP Securities LLC; Roth Capital Partners, LLC; Morgan Stanley & Co., Inc.; and Jefferies & Co., Inc.

derwriter Defendants, excluding Morgan Stanley and Jefferies & Co., provided underwriting for the offering. The Series A stock was sold pursuant to a Form S–3 registration statement and prospectus. These documents are collectively referred to as "Series A Registration Statement." [6] (Compl.¶¶ 236–238.) The Series A Registration Statement incorporated by reference the following documents: New Century's quarterly report (Form 10–Q) for the quarter ended March 31, 2005 and current report (Form 8–K) filed on or around May 5, 2005. (*Id.* at ¶ 238.) The Form 8–K had a May 5, 2005 press release attached as an exhibit.

In August 2006, New Century sold its Series B preferred stock, for net proceeds of approximately $55.6 million. The Underwriter Defendants, excluding Deutsche Bank, Piper Jaffray, JMP Securities, and Roth Capital, provided underwriting for the offering. The Series B stock was also sold pursuant to a Form S–3 registration statement and general prospectus. These documents are collectively referred to as "Series B Registration Statement." [7] (Compl.¶¶ 256–258.) The Series B Registration Statement incorporated by reference the following documents: New Century's annual report (Form 10–K) for the year-ended December 31, 2005, quarterly reports (Forms 10–Q) for the quarters ending March 31, 2006 and June 30, 2006. (*Id.* at ¶ 258.)

### D. *New Century's Disclosures*

On February, 7, 2007, New Century disclosed that during the first three quarters of 2006, it did not properly discount the allowance for loan repurchase losses "by the amount the repurchase prices exceed the fair values" and "did not properly con-

sider … the growing volume of repurchase claims that resulted from the increased pace of repurchase requests that occurred in 2006.…" (Compl.¶ 457.) It explained that "earnings-related press releases for those periods should no longer be relied upon" and to expect "a net loss for that period." (*Id.*) It further noted that "errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006." New Century additionally explained that adjustments were expected for its residual interests held as securities. (*Id.*)

On March 1, 2007, New Century disclosed that it would be unable to file a timely 2006 year-end financial report (Form 10–K). On March 2, 2007, New Century filed a notification of late filing with the SEC, in which it stated that its Audit Committee had initiated an independent investigation of the issues related to the need for financial restatements; that it expected to conclude that there were material weaknesses in internal control over financial reporting; that modifications to the ALL would result in lower, restated net income for the first three quarters of 2006; that there were declines in earnings and profitability for 2006; and provided additional disclosures, including that the SEC requested a meeting with the company and the U.S. Attorney's Office had initiated a criminal investigation. (Compl.¶ 464.)

On March 12, 2007, New Century disclosed that certain lenders discontinued financing for the company, that this would allow lenders to accelerate the company's obligations to repurchase loans, and that this could total $8.4 billion in repayment

---

**6.** In the Complaint, the documents are referred to as "Series A Preferred Stock Registration Statement." (177)

**7.** In the Complaint, the documents are referred to as "Series B Preferred Stock Registration Statement." (185)

obligations. New Century further disclosed that it lacked the liquidity to keep pace with the repurchase requests. (*Id.* at ¶ 472.) After close of trading on March 13, 2007, the New York Stock Exchange delisted New Century stock. (*Id.* at ¶ 476.)

On May 24, 2007, New Century filed a Form 8–K providing that, in addition to its restatements with respect to 2006, the Audit Committee had found "errors in the Company's previously filed annual financial statements [for 2005] . . . with respect to both the accounting and reporting of loan repurchase losses," and found it "more likely than not that these errors . . . resulted in a material overstatement of pretax earnings . . . [such that] the [annual financial statements for 2005] should no longer be relied upon." (Compl.¶ 482.) The Form 8–K further explained that New Century had overstated its residual interests. (*Id.* at ¶ 96)

On April 2, 2007, New Century filed for Chapter 11 bankruptcy protection. (*Id.* at ¶ 480.) On February 29, 2008 the Bankruptcy Examiner's Report was filed, and was publicly released on March 26, 2008.

### E. *Plaintiffs' Allegations of Material Misstatements and Scienter*

The Complaint alleges that Defendants were responsible for false and misleading statements regarding New Century's financial condition, internal controls, underwriting standards and loan quality, and in audits of the company, and improper underwriting and auditing standards. The Complaint further alleges that the Officer Defendants and KPMG's alleged misrepresentations were fraudulently made. The Complaint asserts that these misstatements caused damages to New Century shareholders.

### 1. *New Century's Financial Statements and GAAP Compliance*

Plaintiffs' Complaint alleges that New Century's financial statements in 2005 and 2006, during the Class Period, contained a number of false and misleading statements in violation of generally accepted accounting principles ("GAAP"). (Compl.¶ 66.)

First, the Complaint alleges that New Century materially understated its reserve fund for repurchase of loans in default. (*Id.* at ¶¶ 69–100.) The GAAP required New Century to maintain an allowance for repurchase losses ("reserve"), which provides a reserve to repurchase loans purchased by third-parties in the event of payment defaults by borrowers. (*Id.* at ¶¶ 70, 457.) Upon repurchase of the loans, New Century was required to list those loans on its balance sheet as "Mortgage Loans Held for Sale", and to reduce the repurchase reserve by the amount that the repurchase prices exceeded fair value. (*Id.* at ¶ 70.)

In its 2005 Form 10–K, New Century represented that the reserve was "adequate" based on a risk evaluation. (*Id.* at ¶ 71.) In its disclosures on February 7, 2007, New Century provided that its financial statements for the first three quarters of 2006 were inaccurate because the reserve was understated, due to improper accounting and weak internal controls over financial reporting. (*Id.* at ¶ 72.) In disclosures on May 24, 2007, New Century further provided that the 2005 financial statements needed restatement due to "errors" in "both the accounting and reporting of loan repurchase losses." (*Id.* at ¶ 73.) Based on these disclosures, information provided by several former employees, and additional documents, the Complaint alleges that the reserve was inadequate to keep up with mounting repurchase claims, the reserve was materially understated by tens of millions of dollars

during the Class Period, and in effect, this overstated New Century's income. (*Id.* at ¶ 74, 91, 95, 100.)

Second, the Complaint alleges that New Century materially misstated the value of residual interests in securitizations structured as sales. (*Id.* at ¶ 101.) New Century reflected the present value of residual interests in a securitized pool of loans on its balance sheet. Its quarterly valuation involved an estimation of the effect of delinquencies and defaults on the expected cash flows from these residual interests. (*Id.* at ¶¶ 102–103.) The February 7, 2007 and May 24, 2007 disclosures referred to "errors" in the valuation of residual interests. (*Id.* at ¶¶ 105.) The Complaint alleges that the value of New Century's residual interests were inflated as a result of a failure to account for decreasing loan quality and underwriting standards, and for increased rates of delinquencies and defaults during 2005 and 2006. (*Id.* at ¶¶ 104–105.)

Third, the Complaint alleges that New Century misrepresented its Allowance for Loan Losses ("ALL"), which was a reserve of funds to cover losses on "Mortgage Loans Held for Investment." (Compl.¶ 109–118.) New Century evaluated the ALL based upon "the performance of loans, credit characteristics of the portfolio, the value of the underlying collateral and the general economic environment." (*Id.* at ¶ 110.) Yet the ALL was actually decreasing as a percentage of "Mortgage Loans Held for Investment" that were 60 or more days delinquent, and was being reduced as the rate of delinquent loans was rising. (*Id.* at ¶¶ 111–112.) The Complaint alleges that New Century's ALL failed to meet GAAP and SEC requirements during the Class Period. (*Id.* at ¶ 115.)

Finally, the Complaint alleges a number of additional GAAP violations related to mortgage servicing rights, deferred origi-

nation fees, hedging, and goodwill. These alleged violations are based upon the Bankruptcy Examiner's report. (*Id.* at ¶ 119.)

### 2. *New Century's Underwriting and Loan Quality*

The Complaint alleges that Defendants made false and misleading statements regarding New Century's underwriting standards and loan quality. During the Class Period, the Officer Defendants made public statements regarding the company's "strong," "excellent," "very high" credit quality, and that the credit quality was "better" than in the past because the Company used "strict," "improved," and "strong" underwriting guidelines. (Compl.¶ 120.) These public statements were contrary to data on increasing defaults. (*Id.* at ¶¶ 120–121.) Also contrary to these statements, and notwithstanding the increasing interest rates and downturn in the real estate market, the underwriting standards were loosened in order to increase the volume of loans. (*Id.* at ¶ 125.) The Complaint recites data and confidential witness statements that purport to show the rising rates of delinquent New Century loans, the poor quality of loans issued by New Century, weak internal controls, and lenient loan origination standards. (*Id.* at ¶¶ 126–168.) The convergence of these factors created a "recipe for disaster[.]" (*Id.* at ¶ 172.)

The Complaint alleges that New Century Officer Defendants touted the company's internal controls, loan quality, and underwriting standards throughout the Class Period. (Compl.¶ 191.) The Complaint points to specific statements by individual officers. These statements are alleged to have been false and misleading given evidence of inadequate lending practices including significant deficiencies and material weaknesses in internal controls,

some which the company admitted and others which were undisclosed. (*Id.* at ¶¶ 193–194.) The Complaint maintains that these were material misrepresentations, and cannot be explained away by market forces. (*Id.* at ¶¶ 125–130.)

The Complaint further alleges, with respect to the Officer Defendants, that each made knowing and reckless misstatements. Each signed quarterly certifications that the company's internal controls were adequate. These certifications were made in spite of overwhelming evidence that internal controls and loan quality were inadequate. (*Id.* at ¶¶ 486–487.) Each also signed the SEC filings attesting that its accounting practices complied with GAAP in relation to the loan repurchase reserve and the reporting of residual interests. Similarly, the Complaint alleges violations of the GAAP in maintenance of the reserve and valuation of residual interests. (*Id.* at ¶¶ 23–26, 489.) Several statements, such as describing the repurchase requests as "modest", are alleged to be knowing and reckless misstatements in light of the known rise in defaults and inadequacy of the reserve. (*Id.* at ¶¶ 438, 452.) Moreover, Defendant Dodge is alleged to have failed to disclose to the Audit Committee a change in the methodology for calculating the repurchase reserve, although she had the opportunity to do so. (*Id.* at ¶ 497.) The Officer Defendants received over $50 million in dividend payments as New Century's loan origination increased. The Complaint further alleges a motivation to enlarge loan volume and reduce repurchase reserves to inflate earnings no matter the risk to the company and its investors. (*Id.* at ¶¶ 502–514.)

### 3. *KPMG's Audit Opinions*

The Complaint alleges that KPMG issued audit opinions regarding (i) New Century's 2005 year-end financial statements and (ii) New Century's internal controls as of December 31, 2005, that contained material misstatements in violation of the Public Company Accounting Oversight Board ("PCAOB") standards. (Compl. ¶ 206.) Both of these opinions were incorporated into the Series B stock offering. (*Id.* at ¶ 207.)

The PCAOB has adopted the generally accepted auditing standards ("GAAS"). (*Id.* at ¶ 205.) The GAAS require an auditor to exercise due professional care, to adequately plan its audit, to sufficiently understand a business's internal structure, and to obtain sufficient evidence to reach reasonable conclusions. (*Id.* at ¶ 210.) KPMG allegedly failed to adhere to the GAAS by having an inexperienced audit team, (id. ¶ 222–223); failed to challenge New Century management for its low discount rates on residual interests or its hedge accounting (id. at ¶ 224–226); failed to test the repurchase reserve despite evidence of internal control weaknesses and apparently inaccurate estimates of outstanding repurchase requests (id. at ¶¶ 227–229); failed to properly identify the flaws in valuation of residual interests (id. at ¶¶ 231–32); and failed to raise deficiencies and inaccuracies in New Century's accounting practices or internal controls. (*Id.* at ¶¶ 233–234.)

The Complaint further alleges that KPMG's misstatements were deliberately or recklessly false and misleading. KPMG auditors simply ignored evidence that New Century needed to improve its accounting practices, including recommendations from other KPMG experts. (*Id.* at ¶¶ 516–519.) KPMG made conscious decisions to allow inexperienced staff, including first-year auditors in some instances, to conduct analyses of accounting and internal controls. (*Id.* at ¶¶ 520–522.) In 2004, KPMG identified New Century's failure to adopt appropriate procedures for calculation of the repurchase reserve, but when that problem was again identified in 2005, KPMG still determined that the problem was not

a significant deficiency. (*Id.* at ¶¶ 523–524.) KPMG identified weaknesses in valuation of residual interests, but accepted New Century's valuations in spite of evidence that indicated those valuations were predicated on doubtful assumptions. (*Id.* at ¶¶ 525.) The Complaint sets KPMG's failure to challenge New Century's business practices in its audits against the findings of significant deficiencies in 2006 and since. (*Id.* at ¶¶ 527–528.)

### F. *Plaintiff's Claims*

This action alleges the following claims: (1) violations of Section 11 of the Securities Act in connection with the Series A stock against the Officer Defendants, the Director Defendants, and the Underwriter Defendants Bear Stearns, Deutsche Bank, Piper Jaffray, Stifel Nicolaus, JMP Securities, and Roth Capital; (2) violations of Section 15 of the Securities Act in connection with the Series A stock against the Officer Defendants for control person liability based upon Section 11 and Section 12(a) violations by New Century; (3) violations of Section 11 of the Securities Act in connection with the Series B stock against the Officer Defendants, the Director Defendants,[8] and the Underwriter Defendants Bear Stearns, Morgan Stanley, Stifel Nicolaus, and Jeffries & Company; (4) violations of Section 15 of the Securities Act in connection with the Series B stock against the Officer Defendants for control person liability based upon Section 11 and Section 12(a) violations by New Century; (5) violations of Section 10(b) of the Exchange Act against the Officer Defendants; (6) violations of Section 20(a) of the Exchange Act against the Officer Defendants; and (7) violations of Section 10(b) of the Exchange Act against KPMG. (Compl.¶¶ 289–340, 551–571.)

## II. DISCUSSION

### A. *Legal Standard—Motions to Dismiss*

Federal Rule of Civil Procedure 8(a) provides that a complaint need only contain "(1)a short and plain statement of . . . jurisdiction, . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Federal Rule of Civil Procedure 9(b) provides that the "circumstances constituting fraud or mistake shall be stated with particularity" in a complaint. Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted.

When considering a 12(b)(6) motion to dismiss for failure to state a claim, "all allegations of material fact are accepted as true and should be construed in the light most favorable to the plaintiff." *Resnick v. Hayes,* 213 F.3d 443, 447 (9th Cir.2000); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). A court properly dismisses a complaint on a Rule 12(b)(6) motion based upon the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under the cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir. 1988).[9]

---

**8.** Count One with respect to Series A Stock is not raised against director Einhorn. Count Three with respect to Series B stock is not raised against directors Sandvik and Popejoy.

**9.** Recently, in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court emphasized that "a plaintiff's obligation to provide the

grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (internal quotation marks and alterations omitted). The Court made clear, however, that its holding did "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."

### B. *The Organization of the Second Amended Complaint*

On January 31, 2008, the Court granted Defendants' motions to dismiss with leave for Plaintiffs to amend their Complaint. The Court's Order focused almost entirely on its difficulty evaluating whether Plaintiffs stated a claim in light of the organization and length of the Complaint. The Court granted leave to amend so that Plaintiffs could reorganize and revise their allegations with an eye toward clarity.

Defendants read this Court's prior Order to require dismissal here. Having once before dismissed Plaintiffs' Complaint for lack of organization, Defendants sense that they may again prevail on this basis. Defendants go to great lengths to point out all of the ways that Plaintiffs have failed to comply with the Court's prior Order, have persisted in drafting disorganized, meandering allegations, and have engaged in "puzzle-pleading."

The Court shares Defendants' frustration with the length of the Second Amended Complaint. It is truly massive. As the Officer Defendants pointed out at oral argument, the Consolidated Complaint that was subject to the Court's January 31, 2008 Order ran roughly 100 pages. The Second Amended Complaint weighs in at nearly 375 pages of allegations, with nearly 200 additional pages of charts. Although the Court recognizes that a complicated case necessarily requires a complicated complaint, the Court finds it difficult to fathom that the Complaint could not have been significantly more concise. It appears to the Court that Plaintiffs' approach in the Second Amended Complaint was to reproduce much of the Bankruptcy Examiner's Report in the Complaint alongside Plaintiffs' other allegations.[10] The Court questions whether the Complaint provides manageable roadmap for litigation.

Nevertheless, despite these remaining reservations, the Court does not consider its prior Order to serve as a basis for dismissal on the instant motions. The Court finds Plaintiffs' Second Amended Complaint to be responsive to the concerns with clarity it expressed in the January 31, 2008 Order. The Complaint has been extensively revised. Plaintiffs have both eliminated certain allegations and added additional information. Plaintiffs have provided charts that provide additional structure to allegations of false and misleading statements. And despite the lengthy quotation from the Bankruptcy Examiner's Report, Plaintiffs' organization shows that this quotation was deliberate and selective. The Court is now able to evaluate whether the allegations sufficiently state a claim. To the extent that the Complaint fails to identify false and misleading statements, or lacks sufficient particularity when required, the Court will rule accordingly. Any continuing lack of simplicity and conciseness in the allegations will likely hurt rather than help Plaintiffs' position.

█ This Court, like many others, will not hesitate to dismiss long, unwieldy pleadings. *See, e.g., In re Splash Technology Holdings, Inc. Securities Litig.,* 160 F.Supp.2d 1059, 1073 (N.D.Cal.2001). Nei-

---

*Id.* at 1974. *Twombly* warns of the insufficiency complaints filled with "legal conclusion[s] couched as [] factual allegation[s]." *Id.* at 1965 (internal quotation marks omitted). Yet it does not fundamentally alter Rule 8's pleading requirements, which is designed to "give the defendant fair notice." *Id.* at 1964 (internal quotation marks omitted).

**10.** In addition to quoting the Report at length, the Complaint also cites lengthy chunks of pages from it. (*See, e.g.,* Compl. ¶ 174 (citing pages 109–76 of the Bankruptcy Examiner's Report).)

ther courts nor defendants should have to wade through the morass of "puzzle pleadings" as this wastes judicial resources and undermines the requisite notice for a defendant to respond. *See id.* at 1073–75. Yet a long and detailed complaint is not a work of "puzzle pleading" as a matter of law. Furthermore, in the securities class action context, the stringent pleading requirements appear to invite both parties to throw everything and the kitchen sink into their respective pleadings and motions to dismiss. The plaintiff creates an inevitably detailed complaint in anticipation of defendants' rigorous 12(b)(6) motions, and the plaintiff's expectations are confirmed when defendants in due course file those motions.

The plaintiff has the responsibility to craft a clear and concise complaint, but the allegations that discharge this responsibility will depend on the type of action, the specific facts, the number of parties, and other variables. Here, Plaintiffs' Complaint provides adequate organization and sufficiently clear allegations such that this Court is able to rule on Defendants' motions, and Defendants have adequate notice of the allegations against them. Is the pleading still long? Yes. Is it still extremely detailed and complex? Yes. Is this by itself a reason to dismiss the complaint? No.

Nevertheless, the Court notes that the complexity of pleadings and motions to dismiss in securities cases appears to be endemic. In the future, the Court may consider alternative mechanisms, in addition to the regular noticed motion process, to resolve issues in this case in a manner that streamlines arguments, avoids overlap, and conserves judicial resources. For now, the Court proceeds to review Plaintiffs' Complaint and Defendants' motions.

### C. *Defendants' Requests for Judicial Notice*

■ In deciding motions to dismiss, a court may "generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir.2007). A court may take judicial notice of facts that are "not subject to reasonable dispute." Fed.R.Evid. 201(b). A court also may consider documents that are referred to in the complaint, that are "central" to the plaintiff's claims, and whose authenticity is undisputed. *See, e.g., Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds,* 307 F.3d 1119, 1127 (9th Cir.2002).

■ Here, Defendants have requested that the Court take judicial notice of a number of documents, mostly SEC filings. (*See* Officer Defendants' Request for Judicial Notice ("RJN"); Officer Defendants' Suppl. RJN; Underwriter Defendants RJN; Defendant Robert Cole's RJN; Defendant KPMG's RJN.) It is well-established that courts may take judicial notice of SEC filings. *See Dreiling v. Am. Express Co.,* 458 F.3d 942, 946 n. 2 (9th Cir.2006). The Court takes judicial notice of the SEC documents submitted by Defendants. The Officer Defendants also request that the Court take judicial notice of the Bankruptcy Examiner's Report. The Court finds that it may consider the Report either as a document referred to in Plaintiffs' Complaint or as a document subject to judicial notice. The Underwriter Defendants request judicial notice of excerpts from the Statement of Financial Accounting Standards ("SFAS"). The Court also grants that request.

### D. *Defendant KPMG's Motion to Strike*

■ Under Federal Rule of Civil Procedure 12(f), a court "may order stricken

from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are not favored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.*, 758 F.Supp. 1335, 1339 (N.D.Cal.1991). This is "because of the limited importance of pleadings in federal practice and because [a motion to strike] is usually used as a delaying tactic." *RDF Media Ltd. v. Fox Broad. Co.*, 372 F.Supp.2d 556, 561 (C.D.Cal.2005).

Courts will not grant motions to strike unless "convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *Id.* When ruling on a motion to strike, this Court "must view the pleading under attack in the light most favorable to the pleader." *Id.* For a motion to strike to be granted, the grounds for the motion must appear either on the face of the complaint or from matters of which the Court may take judicial notice. *See SEC v. Sands*, 902 F.Supp. 1149, 1165 (C.D.Cal.1995).

Here, Defendant KPMG moves to strike all references in the Complaint to the Bankruptcy Examiner's Report. KPMG argues that Plaintiffs' reliance on the Examiner's Report violates their duty under Federal Rule of Civil Procedure 11 to conduct "a 'reasonable and competent inquiry' into the facts of the case before signing and filing the complaint." (KPMG's Mot. Strike 4 (citing *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002))). KPMG points to several cases where a plaintiff's adoption of allegations drawn from non-party's complaint or report have been stricken, at least until such time as the plaintiff has conducted an independent investigation of those allegations. *See, e.g., In re Connetics Corp. Secs. Litig.*,

542 F.Supp.2d 996, 1004–06 (N.D.Cal.2008) (striking allegations drawn from SEC complaint, but allowing amendment if plaintiff conducted a reasonable investigation into those allegations).

Plaintiffs counter that the relevant inquiry is not whether attorneys personally verify allegations from such a report, but rather, whether the source is reliable. *See Daou*, 411 F.3d at 1015 (finding that "sources relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' "). Plaintiffs maintain that the Examiner's Report is a reliable source. Contrary to KPMG's cited authority, Plaintiffs point to case law where allegations drawn from a bankruptcy examiner's report were allowed, and were not stricken. *See In re Enron Corp. Secs. Litig.*, MDL–1446, CV No. H–01–3624, 2005 U.S. Dist. LEXIS 41240, at *23, 2005 WL 3504860, at *6 (N.D.Tex. Dec. 22, 2005).

The Ninth Circuit in *Daou* determined that a plaintiff must state with particularity the sources of information alleged, and that satisfaction of this requirement allows a court to accept allegations issuing from those sources, as long as there are "adequate corroborating details." *Daou*, 411 F.3d at 1015 (citations omitted). The court noted that it adopted this standard from the Second Circuit's decision in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). In the *Enron* litigation, the district court also relied on *Novak* in allowing the plaintiff's allegations drawn from the bankruptcy examiner's report. The court explained that the PSLRA does not require a plaintiff to plead facts from personal knowledge, *id.* at *23 n. 11, 2005 WL 3504860 at *6 n. 11, and indicated that a plaintiff may meet the PSLRA pleading requirements "by providing documentary

evidence and/or sufficient general description of the personal sources of the plaintiffs' beliefs," *id.* (quoting *Novak*, 216 F.3d at 314). The court found that the bankruptcy examiner's report was documentary evidence, noted the examiner's statutory obligation to perform a "disinterested" investigation, and thus found that the plaintiff was permitted to rely on the report. *Id.* at *23 n. 11, *35–40, 2005 WL 3504860 at *6 n. 11, *10–11.

Here, Plaintiffs have recited a significant number of statements from the Examiner's Report. Plaintiffs do not indicate that they have independently investigated the Examiner's statements in the report. Instead, Plaintiffs emphasize the reliability of the report as a source of information regarding New Century and Defendants' practices, and that the report only supplements the investigation made in preparation of the Complaint.[11] The Court will allow the allegations drawn from the Examiner's Report because the allegations are derived from documentary evidence that qualifies as a reliable source for pleading purposes. *See Daou*, 411 F.3d at 1015; *In re Enron Corp. Secs. Litig.*, 2005 U.S. Dist. LEXIS 41240, at *23 n. 11, 2005 WL 3504860, at *6 n. 11.

Plaintiffs are thus entitled to rely on the report in framing allegations to satisfy the PSLRA's pleading requirements.[12] Although Plaintiffs did not attach the Examiner's Report as an exhibit to their Complaint, the Court may consider the report because it is referred to in the complaint, is "central" to the plaintiff's claims, and its authenticity is undisputed. *See, e.g., Branch*, 14 F.3d at 454. The Court has already taken judicial notice of the report.

Moreover, as was noted by the Enron court, there is no requirement that consideration of the report be limited to those excerpts quoted by Plaintiffs in their complaint; rather, because the complaint refers to the report, "the Court can view any statement selectively quoted or referenced in the context from which it was drawn to protect against any misrepresentation or misinterpretation." *See In re Enron Corp. Secs. Litig.*, 2005 U.S. Dist. LEXIS 41240, at *40 n. 20, 2005 WL 3504860, at *11, n. 20.

KPMG additionally moves to strike Exhibits D and E to the Complaint, which are the charts requested by the Court in its January 31, 2008 Order. The Court declines to strike the charts. To the extent that Plaintiffs may misrepresent KPMG's responsibility for any statements, the Court will review the Complaint and the attached exhibits, and make any appropriate determinations.

### E. *Plaintiffs' Claims Under Sections 10(b) and 20(a) of the Exchange Act Against the Officer Defendants*

The Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, requires securities fraud claims to satisfy the heightened pleading requirement "that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001)). The PSLRA provides that

> "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is

---

11. The Complaint makes clear that Plaintiffs have investigated other allegations in the Complaint.

12. KPMG's objection that the report is hearsay is a non-issue at the pleading stage. *See*

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1272 (N.D.Cal.2000) (noting that plaintiffs, at the pleading stage, "are only required to plead facts, not to produce admissible evidence").

made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

15 U.S.C. § 78u–4(b)(1).

A plaintiff must also "state with particularity ... facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The "required state of mind" is "deliberate[ ] reckless[ness] or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). The facts alleged in a complaint will give rise to a "strong inference" of scienter when it "plead[s] facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs, Inc., et al. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2513, 168 L.Ed.2d 179 (2007). In evaluating whether the pleadings suggest a strong inference of scienter, the Court must consider the allegations in the Complaint "holistically." *Id.* at 2511.

### 1. *Section 10(b) of the Exchange Act*

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The elements of a claim under section 10(b) are (1) the misrepresentation or omission of a material fact, (2) scienter, (3) plaintiff's reliance on the misrepresentation, and (4) damages. *See Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996) (en banc). A plaintiff's complaint must satisfy the PSLRA's particularity requirements. *See In re Silicon Graphics*, 183 F.3d at 983.

### a. *Materially False and Misleading Statements*

Plaintiffs claim three primary categories of misrepresentations that give rise to liability under Section 10(b) and Rule 10b–5: (1) misrepresentations in New Century's reporting of its earnings, repurchase reserve, and residual interest valuations; (2) misrepresentations of New Century's internal controls; and (3) misrepresentations of New Century's loan quality and underwriting. These misrepresentations are alleged to have been made in press releases,[13] investor conference calls and meetings,[14] and SEC 10–Q and 10–K forms.[15]

---

**13.** 1st quarter 2005 earnings press release Statements [hereinafter St. or Sts.] (1, 2), 2nd quarter 2005 earnings press release ( ), 3rd quarter 2005 earnings press release (9), 4th quarter 2005 earnings press release, 1st quarter 2006 earnings press release (32–34), 2nd quarter 2006 earnings press release (39), September 2006 press release (45), 3rd quarter earnings press release (46). (Compl.Exh.E.)

**14.** 1st quarter 2005 earnings conference call (3, 4), 2nd quarter 2005 earnings conference call (3, 4), September 2005 investor roundtable (15, 16), 3rd quarter 2005 earnings conference call (18–20), 4th quarter and year-end earnings conference call (26–27), 4th quarter earnings conference call (42), 3rd quarter 2006 investor and analyst conference call (47–48) (Compl.Exh.E.)

### i. *Group Pleading*

■ Plaintiffs argue that they may rely on the group pleading doctrine for company-issued press releases. (Opp. at 33–34.)[16] The Officer Defendants contest the viability of the group pleading doctrine.

A question not decided by the Supreme Court in *Tellabs*, and that remains open within the Ninth Circuit, is whether group pleading remains viable after the PSLRA. *See Tellabs*, 127 S.Ct. at 2511 n. 6. A judicially-created way of satisfying the particularity requirement of Rule 9(b), the group pleading doctrine establishes a presumption, for purposes of drafting a complaint, that statements in "group-published information" such as prospectuses, registration statements, annual reports, or press releases are "the collective work of those individuals with direct involvement in the day-to-day affairs of the company." *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 759 (N.D.Cal.1997) (quotations and citation omitted); *In re Glen-Fed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir.1995).

The courts that have considered whether the group pleading doctrine still stands in the wake of the PSLRA have come to conflicting conclusions. The Ninth Circuit has not expressly rejected the group pleading doctrine, and some courts still apply it. *See, e.g., In re Secure Computing Corp. Sec. Litig.*, 120 F.Supp.2d 810, 821–22 (N.D.Cal.2000); *In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. 06–1505, 2007 U.S. Dist. LEXIS 83007, 2007 WL 3171435 at *7 (W.D.Wash.2007) (listing cases). The trend, however, is against the continued viability of the doctrine. All of the Circuit courts that have expressly considered whether group pleading is compatible with the PSLRA have concluded that it is not. *See Winer Family Trust v. Queen*, 503 F.3d 319, 334–37 (3d Cir.2007); *Makor v. Tellabs*, 437 F.3d 588, 602–03 (7th Cir.2006), *overruled on other grounds by Tellabs*, 127 S.Ct. at 2511 n. 6; *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365–66 (5th Cir.2004).[17] Additionally, several district courts have refused to apply the group pleading doctrine after *Tellabs*, and the majority of reported district court cases in the Ninth Circuit appear to hold that the doctrine is no longer viable. *See, e.g., In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F.Supp.2d 1083, 1092 (C.D.Cal.2008); *In re Amgen Secs. Litig.*, 544 F.Supp.2d 1009, 1036–37 (C.D.Cal.2008); *In re Hansen*

---

**15.** 1st quarter 2005 Form 10–Q (5), 2nd quarter 2005 Form 10–Q (11–14), 3rd quarter 2005 Form 10–Q (21), year-end 2005 10–K Form (28–31), 1st quarter 2006 Form 10–Q (35–38), 2nd quarter 2006 Form 10–Q (41–44), 3rd quarter 2006 Form 10–Q (49–52). (Compl.Exh.E.)

**16.** Where the Officer Defendants are *quoted* in press releases or have signed documents, the defendants are properly held liable for those statements, and the group pleading doctrine does not apply. Although the Officer Defendants contest the accuracy of some of these attributions, they do not appear to challenge the principle that properly attributed quotations or signatures are not "group pled" and may be a basis for liability. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061–

62 (9th Cir.2000)(discussing the importance of holding signers of SEC documents responsible for the statements they are signing).

**17.** Other Circuits have recognized the split in authority, but have found it unnecessary to decide the issue in the context of the particular case. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 961 n. 6 (8th Cir.2008); *Miss. Public Employees Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 93 (1st Cir. 2008); *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1018–19 (11th Cir.2004) (declining to rule, but acknowledging that "the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations").

*Natural Corp. Sec. Litig.*, 527 F.Supp.2d 1142, 1153–54 (C.D.Cal.2007).[18]

Those courts that have found the group pleading doctrine in conflict with the PSLRA have tended to rest their analysis on two points. First, they emphasize the statute's use of "the defendant." *See In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1029 (S.D.Cal.2005); *Southland*, 365 F.3d at 364–65. That is, the PSLRA expressly requires that the untrue statements or omissions be set forth with particularity as to "the defendant," and that "with respect to each act or omission alleged to violate this chapter, [the complaint must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1),(2); *Southland*, 365 F.3d at 364–65 ("These PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were sued each alone in several separate actions."). Second, they argue that the continuation of the group pleading doctrine would undermine the effectiveness of the PSLRA. By enacting the PSLRA, Congress intended to impose heightened pleading requirements for plaintiffs bringing fraud actions and, in doing so, to erect a hurdle that would protect against unmeritorious litigation. *See Tellabs*, 127 S.Ct. at 2508. If courts were to allow plaintiffs to impute misstatements or intent from one defendant to another, courts have reasoned, plaintiffs would be able to skirt the heightened pleading standards by making detailed allegations against one defendant and imput-

ing those statements to other defendants. *Immune Response*, 375 F.Supp.2d at 1029–30. The courts have qualified this ban on group pleading, however, by leaving open the possibility that, even when allegedly problematic statements do not have a stated author, plaintiffs may still meet the requirements of the PSLRA by alleging facts that connect a particular defendant to an otherwise unattributed press release. *See Southland*, 365 F.3d at 365 ("[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.").

The Court is persuaded by this reasoning. Joining the majority of other courts in this Circuit, the Court holds that group pleading is no longer viable under the PSLRA. Thus, to the extent Plaintiffs' allegations attributing statements to the Officer Defendants rest solely on the group pleading doctrine, the Complaint does not sufficiently plead liability for those statements. While the group pleading doctrine is not fatal to allegedly misleading statements in SEC filings signed by the Officer Defendants, *see Howard*, 228 F.3d at 1061–62, the Officer Defendants cannot be liable for the press releases, except to the extent there are specific statements attributed to them, or the press releases are otherwise connected to them, *see Southland*, 365 F.3d at 365. Because the Complaint alleges violations of statements for each of the Officer Defendants that do not rest on the group pleading doctrine, this holding does not preclude any of the Officer Defendants from liability.

---

**18.** District Courts in the Southern District of New York continue to hold that the group pleading doctrine is viable. *In re BISYS Sec.*

*Litig.*, 397 F.Supp.2d 430, 439 n. 42 (S.D.N.Y. 2005) (listing cases).

### ii. *Loan Quality and Underwriting*

■ The Complaint alleges material misstatements regarding loan quality and underwriting. In a number of documents, New Century is described, for example, as having loans of "higher credit quality," "improved underwriting controls and appraisal review process," "a strategy [of selecting borrowers with increasing credit scores]," "strict underwriting and risk management disciplines," and "better credit quality." (*See, e.g.,* Compl.¶¶ 343, 344, 347, 358, 361, 364, 387, 388, 405, 422, 443.) The Complaint ushers an array of confidential witness statements that attest to New Century's progressively riskier loan origination practices leading up to and throughout the Class Period (Compl.¶¶ 137–168); analyzes data indicating rising defaults and delinquent loans (Compl.¶¶ 120–125); and sets forth data, that corroborates the witnesses, showing a proliferation of high-risk loans such as adjustable-rate mortgages provided to less-qualified borrowers (Compl.¶¶ 126–136.).

The pleadings adequately support a finding that these statements were false and misleading when made. Two recent district court cases in the Ninth Circuit have found similar statements regarding loan quality and underwriting to provide a basis for actionable securities law violations. *In re Countrywide Fin. Corp. Derivative Litig.,* 542 F.Supp.2d 1160 (C.D.Cal.2008); *Atlas v. Accredited Home Lenders Holding Co.,* 556 F.Supp.2d 1142, 1149 (S.D.Cal.2008). This Court likewise agrees that these statements are actionable, and that Plaintiffs' Complaint alleges sufficient facts that the statements were material misrepresentations of New Century's loan quality and underwriting practices.

The Officer Defendants specifically challenge Plaintiffs' allegations that statements about loan quality and underwriting were false when made. The Officer Defendants first argue that Plaintiffs are unable to allege material false statements when New Century disclosed data to the public revealing the nature of its loan portfolio and included cautionary language in stock offering documents. It is also asserted in the Officer Defendants' and Defendant Cole's motions, and more fully articulated in the Underwriter Defendants' motion, albeit in the Section 11 context, that Plaintiffs cannot challenge "forward-looking statements" and that statements of "mere puffery" do not qualify as actionable misstatements.

The "bespeaks caution" doctrine is a limit on defendant's liability under the securities laws. This doctrine "developed to address situations in which optimistic projections are coupled with cautionary language ... affecting the reasonableness of reliance on and the materiality of those projections." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1414 (9th Cir.1994). The PSLRA's safe harbor provision, which is the codified equivalent of the "bespeaks caution" doctrine, *see Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1132 (9th Cir.2004), provides that forward-looking statements cannot be the basis for a securities fraud claim if: (1) the statement is identified as forward looking and is accompanied by sufficient cautionary statements; or (2) the person who made the forward-looking statement did so without actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u–5(c)(1)–(2).[19] Similarly, statements that "are vague and constitute run-of-the-mill

---

**19.** It is appropriate to consider the application of the bespeaks caution doctrine and safe harbor provision simultaneously. *In re Cop-* *per Mountain Sec. Litig.,* 311 F.Supp.2d 857, 876 (N.D.Cal.2004).

corporate optimism on which no reasonable investor would rely" fall into this category. *Copper Mountain*, 311 F.Supp.2d at 869.

■ The Court cannot determine as a matter of law that the PSLRA's safe harbor provision is applicable to the statements regarding loan quality and underwriting. A "forward-looking statement" "is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). The statements here, when made, seem to have concerned explanation of New Century's then-current loan origination, underwriting, and performance, at times in relation to the past. Moreover, the references to generalized cautionary language regarding the sub-prime industry appear largely unrelated to whether the alleged statements here were false and misleading. The inconclusive nature of these references cannot support dismissal at the pleading stage. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir.2005) ("Dismissal on the pleadings under the bespeaks caution doctrine … requires a stringent showing: There must be sufficient 'cautionary language or risk disclosure' [such] that reasonable minds could not disagree that the challenged statements were not misleading."). The Court therefore similarly cannot resolve application of the PSLRA safe harbor provision in favor of Defendants at this time.

The Court also finds that the alleged statements cannot be chalked up to "mere puffery." The allegations suggest New Century's repeated assurances of strong credit quality and strict underwriting practices. Even in the sub-prime world, there

must be a basis for distinction between loans to at-risk borrowers that meet basic standards of good lending practice and loans that plainly do not. Those standards may provide the measure for evaluating Defendants' statements. Here, Plaintiffs offer New Century's statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards. That is sufficient to plead false and misleading statements.

iii. *Financial Reporting and Internal Controls*

The Court finds sufficient allegations of materially false and misleading statements in financial reporting. The Complaint details reported information on financial results, the repurchase reserve, and valuation of residual interests, coupled with disclosures in the 2005 10–K, and elsewhere, that those reports were inaccurate. The disclosures support the allegation that the financial reports were false and misleading when made. These disclosures specifically mentioned a failure to track repurchase claims and problems with internal controls as reasons for the inaccurate statements. The Court similarly finds the disclosures referenced in the Complaint sufficient to support the allegations that Officer Defendants made material false and misleading statements regarding the adequacy of internal controls during the Class Period.

■ The Court does not consider the PSLRA safe harbor or the "mere puffery" rule to bar Plaintiffs from pleading Defendants' liability for alleged misrepresentations regarding internal controls and accounting violations. There certainly may be a dispute whether the statements of repurchase reserves and residual interests were representations articulating the pres-

ent state of historical facts, or rather projections estimating a future state of affairs. That dispute notwithstanding, Plaintiffs have alleged an understatement of the repurchase reserve and an improper valuation of residual interests that were both misrepresentations when made. The Complaint details declining loan performance, an increase in defaults, and a concomitant rise in repurchase claims, that were baldly disregarded in setting the reserve and valuing residual interests. This suggests misrepresentations that did not turn on the outcome of future events. Based on Plaintiffs' allegations, the rule barring liability for "forward-looking" statements or "mere puffery" does not warrant dismissal at this time.

b. *Scienter*

The Ninth Circuit treats falsity and scienter as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir.2003); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001). This inquiry requires that a district court on a motion to dismiss "determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements to investors." *Ronconi*, 253 F.3d at 429 (internal quotations omitted).

■ A district court must address competing inferences, whether favorable to the plaintiff or not, that may be inferred from the facts in the complaint. *Daou*, 411 F.3d at 1022. The inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S.Ct. at 2504–05. However, it need not be the "most plausible of competing inferences." *Id.* at 2510. "To meet this

pleading requirement [for scienter], the complaint must contain allegations of specific contemporaneous 'statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432; *cf. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1065–69 (9th Cir.2008) (analyzing the scienter inferences with respect to individual allegations, and then as a whole).

The Ninth Circuit recently addressed the PSLRA's scienter requirement and the Supreme Court's opinion in *Tellabs* in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir.2008). In light of *Tellabs*, the *South Ferry* court explained, a court assessing whether a complaint raises a strong inference of scienter considers the complaint as a whole, though a high level of detail is still required. *South Ferry*, 542 F.3d at 784. That is, "*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of [the Ninth Circuit in] *Silicon Graphics, Vantive*, and *Read–Rite* notwithstanding." *Id.* With respect to allegations relying on an inference of scienter from knowledge of the company's core operations, the *South Ferry* court explained that

[A]llegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." ... Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information.... Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form,

without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

*Id.* at 785–86 (internal citations omitted).

▬▬ The parties dispute the nature of the Court's inquiry into scienter at the 12(b)(6) stage. The Officer Defendants urge the Court to analyze scienter separately as to each violation and each defendant. Plaintiffs emphasize the language in *Tellabs* that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." 127 S.Ct. at 2511. As noted above with respect to group pleading, *see* § II(E)(1)(a)(i), *supra*, the PSLRA's heightened pleading standard appears to require individualized allegations as to scienter. 15 U.S.C. § 78u–4(b)(2).[20] The Court does not read *Tellabs* as excusing Plaintiffs from the

plain requirements of the statute that the complaint shall "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* That is not to say, however, that, in the context of a holistic analysis, allegations will only be relevant to scienter for one statement or one type of statement. Rather, the Court reads the language in *Tellabs* as cautioning courts to view the scienter allegations holistically with respect to each allegedly violative act committed by each defendant. Below, the Court considers Plaintiffs' scienter allegations for each of the three types of allegedly fraudulent acts. The Court finds that Plaintiffs have sufficiently alleged facts giving rise to a strong inference that the Officer Defendants were at least deliberately reckless in making misrepresentations as to loan quality, internal controls, and various financial statements.[21]

**20.** The jurisprudence on the group pleading doctrine addresses both whether a statement may be attributed to a particular defendant and whether scienter may be imputed from one defendant to another. As the Court's discussion of the group pleading doctrine suggests, for the most part, courts have found that group allegations as to scienter run afoul of the particularity requirements of the PSLRA. *See In re Lockheed Martin Corp. Sec. Litig.,* 272 F.Supp.2d 928, 936 (C.D.Cal.2002)("Under no circumstances does the group-published information doctrine relieve plaintiffs of their burden to pled scienter under sub-paragraph 2 of the Act."). The discussion of the core operations doctrine in *South Ferry* does not conflict with the Court's analysis on group pleading. The core operations doctrine is distinct from group pleading, but some of the analytical points—e.g., imputing knowledge from the defendant's position in the company and the nature of the information—overlap.

**21.** In the interest of a clearer analysis, the Court discusses scienter of the Officer Defendants together. The Court finds, however, that the allegations are sufficient to create a strong inference that *each* of the Officer De-

fendants acted with scienter. In their papers and at oral argument, the Officer Defendants argued that the Complaint does not make sufficient connections between each of the Officer Defendants and knowledge of information contrary to what their statements conveyed. The Court disagrees. The Complaint perhaps most clearly connects knowledge that statements were false and misleading to Defendants Morrice and Dodge. (*E.g.,* Compl.¶¶ 179 & n. 24, 189 (loan quality, underwriting, and internal controls); *id.* ¶¶ 75–78, 491, 494 (financial misstatements).) Other allegations, however, connect knowledge of contemporaneous conditions and contrary knowledge to all four Officer Defendants. The Examiner's Report defines Senior Management to include Cole, Gotschall, Morrice, and Dodge from 2004–2006. (Compl. at 56 n. 10; *e.g.,* BER 77–78.) For example, relying on and quoting from the Examiner's Report, the Complaint alleges that New Century's Senior Management "knew from multiple data sources that its loan quality was problematic, starting no later than 2004." (Compl.¶ 175.) Moreover, the Complaint alleges that loan quality was crucial to the core operations of the company, with which these

i. *Loan Quality and Underwriting; Internal Controls*

The Court finds that Plaintiffs' Complaint creates a compelling inference that the Officer Defendants were deliberately reckless in their public statements regarding loan quality and underwriting. First, the confidential witness statements describe a staggering race-to-the-bottom of loan quality and underwriting standards as part of an effort to originate more loans for sale through secondary market transactions. The witnesses catalogue an explosive increase in risky loan products, including interest-only loans,[22] stated income loans, and adjustable-rate loans, and a serious decline in loan quality and underwriting. The Court finds that these witnesses are described with sufficient particularity and that "adequate corroborating details" for their statements are provided. *See Daou*, 411 F.3d at 1015.

Several witnesses portray an underwriting system driven by volume and riddled with exceptions. They state that the goal was to "push more loans through" (Compl.¶¶ 138, 139, 151–154), that "there was always someone to sign off on any loan" (Compl.¶ 140), that nearly any loan was approved to meet its sales projections (Compl.¶¶ 141, 142), and that exceptions were commonly made for the otherwise unqualified (Compl.¶¶ 140, 144, 152, 155). There are specific instances of loose standards, as when an employee recommended denial of a loan application but higher-level managers repeatedly approved those loans, (Compl.¶ 144), or when underwriters allowed rejected loans, usually because borrowers' incomes were too low, a second

chance and approved the formerly rejected loans. (Compl.¶ 146.) There is testimony that instructions, according to managers, came from the corporate officers (Compl.¶ 146), and that officers had access to information on the effects of these practices, including the rising defaults (Compl.¶ 154). There are also indications that the compensation for sales reinforced the disregard for standards and quality as volume was linked to reward.

The Examiner's Report found knowledge within high-levels of the company of its declining loan quality and underwriting as early as 2004. (Compl.¶ 177.) The Report mentions the internal reports by New Century's Senior Management and negative internal audits that acknowledged serious problems with loan quality and underwriting, as well as the poor performance of the company's high-risk products, and concludes that the New Century failed to respond to "red flags." (Compl.¶ 179.) It is as plausible an inference as any other that the Officer Defendants were aware of the alleged pervasive company-wide practice of issuing loans of poor quality without complying with any basic set of underwriting standards. Moreover, the image of a company's falling standards coincide with allegations supported by data of a rise in both delinquency rates and repurchase claims that was also disclosed in internal documentation. (Compl.¶¶ 126–136, 173–190.)

These same allegations also give rise to a strong inference of scienter with respect to alleged misstatements regarding internal controls in the company. Moreover, the Complaint discloses prior knowledge of

central officers were familiar. (Compl.¶ 344.) *See South Ferry*, 542 F.3d at 785. With respect to internal controls, the Complaint alleges that Senior Management knew about problems with its internal controls, and represented to KPMG that it would fix them. (Compl.¶¶ 194–96; 486–87.)

**22.** For example, a former Vice President states that New Century, which always had a stated income loans program for self-employed borrowers, expanded the program to wage-earners starting in 2004 and 2005. (Compl.¶ 137.)

problems with internal controls from before the time of the alleged misrepresentations, (Compl.¶¶ 486–87), and of the growing backlog in repurchase claims, (Compl.¶¶ 75, 77, 92–93). Despite these causes for concern, the Officer Defendants repeatedly certified the internal controls in Sarbanes–Oxley certifications. (Compl.¶¶ 348–49, 362–63, 377–78, 390–91, 409–410, 426–27, 444–45.)

The Complaint may not disclose the kind of "smoking gun evidence" that establishes a clear intent to deceive, but neither does it need to do so. *Tellabs*, 127 S.Ct. at 2510. The allegations are sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different—the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching. The Examiner's Report, to the extent that it does not explicitly find fraud, does not preclude Plaintiffs from pleading fraud. The inference of deliberate recklessness as to false statements regarding loan quality and underwriting is at least as compelling as inferring that the Officer Defendants were simply unaware of New Century's practices when the statements were made, or taken by surprise when the market took an unexpected turn for the worse.

ii. *GAAP Violations, the Repurchase Reserve, Valuation of Residual Interests, and ALL*

 The Complaint alleges scienter with respect to several accounting misrepresentations, including misstatements regarding the adequacy of the repurchase reserve and the valuation of residual interests. "Violations of GAAP standards can … provide evidence of scienter." *Daou,* 411 F.3d at 1016. For GAAP violations to serve as a predicate for scienter, a Plaintiff must allege "enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.* at 1017.

The Complaint alleges that the Officer Defendants represented that the reserve was adequate when the repurchase reserve was actually inadequate to cover the growing backlog of repurchase claims and later disclosures admitted the inadequacy of the reserve. This backlog, according to the Examiner's Report, was "no secret" and "general knowledge" within the company's accounting, finance, and secondary marketing departments. In a September 8, 2006 press release, however, Defendant Morrice referred to the rise in loan payment defaults as merely "modest", when contemporaneously available information indicated a significant rise in repurchase claims and thus suggested otherwise. Further, the Officer Defendants attested to the reserve's adequacy in accordance with GAAP. There is confidential witness testimony that the repurchase claims backlog was intentionally designed to delay payment of repurchase claims to inflate earnings in an effort to "game the system." (Compl.¶¶ 75, 77.)

Having reviewed the detailed allegations, the Court finds that the Complaint contains particularized allegations of scienter with respect to the accounting improprieties at New Century. The allegations indicate an acute awareness within New Century of the backlog making it highly unlikely that officers were unaware that the reserve was inadequate to cover the growing number of repurchase claims. These allegations of reckless accounting violations are bolstered by the particularized allegations of scienter in statements about loan quality and underwriting, which suggest that the Officer Defendants were similarly reckless in appreciating the grav-

ity of the repurchase claims backlog and the inadequacy of the reserve.[23]

The Complaint additionally alleges that the Officer Defendants misstated the value of residual interests in a number of SEC filings. The Court similarly finds that alleged GAAP violations related to residual interests, along with allegations of the backlog, are sufficient for a strong inference of scienter. Further, the fact that the new CEO, Tajvinder Bindra discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly. The allegations of a misstated repurchase claims reserve, along with misrepresentations of the residual interests' value, depict a profound effort to mask New Century's declining loan performance. Therefore, the Court also finds that Plaintiffs have created a compelling inference that the Officer Defendants were deliberately reckless in their misstatements regarding the repurchase reserve and the valuation of residual interests.

The Complaint, however, fails to adequately allege scienter with respect to alleged misrepresentations of the ALL. The Examiner concluded that any accounting violations in setting the ALL actually reduced earnings. The Complaint does not dispute this finding. Even though there are allegations that the ALL was misstated due to GAAP violations, these alleged violations cannot support an inference of fraudulent intent to inflate earnings in an effort to misrepresent New Century's financial condition in a positive light. The reduction in earnings actually suggests otherwise.

### iii. *KPMG Audit*

The Officer Defendants argue that their reliance on KPMG's audit opinion precludes a strong inference of scienter. "Although a clean outside audit opinion does not rule out a finding of scienter, 'a clean audit may be considered in determining whether there is scienter.'" *In re Wet Seal, Inc.,* 518 F.Supp.2d 1148, 1166 (C.D.Cal.2007) (citations omitted). The Court does not, however, consider the KPMG audit opinion to warrant a different conclusion than reached above.

The Officer Defendants do not point to specific references in the KPMG audit opinion that bear on their alleged recklessness in making statements regarding loan quality or underwriting. As for any reliance on KPMG's opinion with respect to accounting violations, the Court does not consider the existence of the audit to preclude a strong inference of scienter under the circumstances here. The Complaint alleges both serious accounting violations by the Officer Defendants and serious auditing violations by KPMG. Especially in the presence of allegations that the officers and the auditor were complicit in the ultimate misrepresentations of New Century's financial condition, "[t]he fact that [New Century's] independent auditor may have approved the accounting methods will not shield [the officers] from liability for deception such methods may have caused." *See Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1314 n. 13 (C.D.Cal.1996). The extent of the Officer Defendants' reliance, the scope of any independent obligations for accounting violations, and whether they were reckless in a spite of the audit opinion remain open questions at this stage. The Court therefore does not consider the audit opinion to

---

**23.** The Court similarly finds that the allegations support a strong inference of scienter as to the unexplained combination of two unre-

lated reserves and the questionable methods utilized in setting the ALL.

undermine the particularity with which Plaintiffs have alleged scienter.

### iv. *Stock Sales, Compensation, and Motive Allegations*

■■ The pleading of insider trading may support a strong inference of scienter. Here, the Complaint discloses a number of stock sales by the Officer Defendants in or around the Class Period. A court must address whether the allegations suggest a compelling inference that "suspicious" sales of stock occurred that were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics,* 183 F.3d at 986. A court will consider the following factors: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading practices. *Id.* A motive to defraud based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter. *See Am. West,* 320 F.3d at 944.

The Complaint alleges that the Officer Defendants sold stock for proceeds of $53 million during the Class Period. These sales accounted for 77% of Defendant Dodge's total holdings, 37% of Defendant Gotschall's total holdings, and 31% of Defendant Cole's total holdings.[24] (Compl.¶¶ 507–514.) The Complaint further alleges that the Officer Defendants were beneficiaries of the inflated earnings caused by their misrepresentations, as they received dividends of $50 million during the Class Period and also bonuses that the Examiner's Report found were 300% higher than they should have been because based on the inflated earnings rather than

New Century's actual financial performance. (Compl.¶¶ 502–505.)

The Officer Defendants contend that the allegations contain scant reference to their prior trading history, and do not indicate a substantial unloading of their holdings. More specifically, the Officer Defendants provide explanations for the sales: Dodge's sales were less than estimated by Plaintiffs; Morrice only made two sales that were less than 10% of his holdings; and Gotschall's sales were part of a plan for retirement and pursuant to a 10b5–1 plan. Defendant Cole, in his motion, also links his sales to retirement in early 2006 and notes that many of his sales occurred before the Class Period. All of the Officer Defendants argue that they held onto a substantial portion of shares for which they suffered losses. They also provide explanations for their bonuses and dividends.

The Court agrees that the Officer Defendants' maintenance of substantial stock holdings for which they suffered losses upon New Century's collapse cut against any insider trading. Nevertheless, the allegations of insider stock sales, dividends, and options at least provides some additional support for the otherwise strong inference of scienter. Notably, the timing of the 10b–5 plans, several years after they became available, at least raises the question precisely why there was a delay in creating those plans, and why they were formed during the Class Period. Although not the strongest set of allegations of insider trading and suspicious compensation, the Court finds that the motive allegations offer minimal additional support for a conclusion of scienter.

**24.** There is no specific allegation calculating the percentage of total holdings sold in stock sales by Defendant Morrice.

### v. *Summary*

The Court finds that the pleadings support a strong inference of scienter.[25] The Court, at this stage, does not view the alternative inferences to be any more compelling than the inference that the Officer Defendants were deliberately reckless in their misrepresentations to the public. The only exception are statements regarding the ALL.

### 2. *Section 20(a) of the Exchange Act*

■ Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. It provides

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). A prima facie case of control person liability requires evidence (a) that a primary violation of the securities laws occurred and (b) that defendant directly or indirectly controlled the person or entity committing the primary violation. *See, e.g., Paracor Finance,* 96 F.3d at 1161.

The Court has found that the pleadings sufficiently allege a primary violation of section 10(b) and Rule 10(b)(5) against each of the Officer Defendants. The Complaint alleges that the Officer Defendants controlled the operation of New Century, and that this caused it to violate section 10(b) and Rule 10(b)(5). This sufficiently

pleads control person liability under section 20(a).

### F. *Plaintiffs' Claims Under Section 10(b) of the Exchange Act Against Defendant KPMG*

### 1. *Materially False and Misleading Statements*

To reiterate, the Complaint alleges that KPMG's audit opinion of New Century's 2005 year-end financial statements and internal controls as of December 31, 2005—incorporated in the Series B stock offering—contained material misstatements in violation of the Public Company Accounting Oversight Board ("PCAOB") standards. (*See supra* Part I.E.3.) The Court has reviewed the allegations in the Complaint, and concludes that it satisfactorily sets forth allegations that KPMG made material misrepresentations in its audit opinion. KPMG does not challenge Plaintiffs' section 10(b) claim on these grounds, however. KPMG focuses on scienter and loss causation.

### 2. *Scienter*

To plead scienter allegations against an auditor, the Ninth Circuit has held that a plaintiff must show "more than a misapplication of accounting principles," and allege with particularity that the auditor's "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that . . . no reasonable accountant would have made the same decisions[.]" *DSAM Global Value Fund v. Altris Software,* 288 F.3d 385, 390 (9th Cir.2002) (quoting *In re Software Toolworks Inc.,* 50 F.3d 615, 627–28 (9th Cir.1994)).

---

**25.** A plaintiff must properly allege reliance and loss causation to state a claim under section 10(b) or Rule 10(b)(5). Here, the Complaint contains allegations of loss causation. The Officer Defendants do not raise a challenge to Plaintiffs' allegations of loss causation.

### a. *Repurchase Reserve*

The Complaint alleges that KPMG was aware of weaknesses in New Century's internal controls prior to its 2005 audit because it noted in its 2004 audit that the company failed to adopt appropriate procedures for calculation of the repurchase reserve. (Compl.¶¶ 523–524.) In working on the 2005 audit, one of KPMG's junior auditors assigned to New Century specifically requested information on outstanding repurchase claims. She learned that approximately $188 million in outstanding requests existed as of year-end 2005. KPMG, while noting in its paperwork that it was aware of the approximate amount of outstanding repurchase claims, did not consider this information in determining the adequacy of the reserve. KPMG endorsed a reserve amount of $70 million despite the significantly larger amount outstanding for repurchase claims. (Compl.¶ 227.) Moreover, the Examiner found that KPMG failed to perform even "minimal" testing in making its reserve calculation, and that such tests would have revealed its material errors. (Compl.¶¶ 228–229.) These failures resulted in inflation of $21 million in New Century's 2005 year-end financial statements. (Compl.¶ 99.)

Here, the Court finds that the Complaint alleges particularized facts of scienter. If the allegations are true, KPMG knew that New Century was utilizing a faulty method for calculating its reserve and that its repurchase claims far outpaced its reserve amount, but did nothing to correct the deficiency. The absence of a meaningful investigation into the flawed accounting methods used in setting the reserve supports a strong inference of scienter. *See Ponce v. SEC*, 345 F.3d 722, 733–34 (9th Cir.2003). Moreover, the absence of any explanation for its failure to correct New Century's severely underfunded reserve in the face of "red flags"

further supports a strong inference of scienter. *See, e.g., In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d at 1044.

The Court is not persuaded that the Examiner's finding that there was no evidence of intentional misrepresentation to be dispositive at the pleading stage. The Court is required to make an independent investigation of any facts obtained through discovery. Moreover, it is matter for summary judgment whether the repurchase claims backlog was not material until 2006 as asserted by KPMG.

### b. *Residual Interests*

Similarly for residual interests valuation, the Complaint alleges that KPMG was aware of internal control deficiencies regarding New Century's methods for determining the value of residual interests based upon its findings in its 2004 audit. (Compl.¶ 231.) During 2005 and in connection with the 2005 audit, KPMG internal specialists raised "red flags" regarding New Century's aggressively low discount rate and its potential to inflate valuations. (Compl.¶ 224) The internal specialists also considered New Century's documentation insufficient for the audit team to proceed in evaluating the valuations, but the team nevertheless proceeded in finding the valuations adequate. The Complaint also refers to New Century's outdated valuation models. This resulted in an overstatement of residual interests of approximately $14 million (Compl.¶ 232.)

Viewing the allegations as a whole, the Court again finds a compelling inference of scienter. The Complaint contains particularized allegations of KPMG's willful failure to consider the opinions of internal specialists when "red flags" were raised about New Century's low discount rate and valuation models. The allegations support an awareness on the part of KPMG's audit team that internal controls

were problematic, but the team nevertheless accepted incomplete documentation in reaching its determinations. The allegations, therefore, suggest more than a simple mistake-willful ignorance of a company's valuation methods may support a strong inference of scienter. Here, Plaintiffs' Complaint meets this standard. KPMG's suggestion that the audit team gave due consideration to its internal specialists opinions may ultimately establish that any misrepresentations in the audit were not reckless. That is a matter properly determined at summary judgment.

#### c. *Hedge Accounting*

The Complaint describes a hedge accounting dispute between a KPMG internal specialist and an audit team partner named Donovan that arose in 2005. (Compl. ¶¶ 225–226.) The specialist objected to New Century's accounting method, and told Donovan that he refused to approve the audit until he was able to review particular documentation. Before the specialist had the opportunity to review the documents, Donovan informed New Century's Audit Committee that the dispute would be resolved. Donovan also sent an e-mail to the specialist in which he expresses dismay that the specialist was raising questions. It was only after the audit was completed that the specialist obtained the documentation. The specialist found an accounting violation that resulted in a misstatement of several million dollars. (*Id.*)

The allegations support an inference that KPMG was aware of a specialist's objection to a particular accounting method, but nevertheless certified the audit without fully exploring the merits of this objection. Yet KPMG points to the attention that was given to the hedge accounting dispute. KPMG's Department of Professional Practice ("DPP") attempted to resolve the disagreement, and the DPP ultimately authorized issuance of the audit after further internal discussion of the issue.

The Court, while finding that KPMG supplies an alternative inference that it made a reasoned judgment whether to issue the audit opinion in spite of the dispute, cannot conclude that Plaintiff has failed to plead at least an equally compelling inference of scienter as to the hedge accounting misstatement. KPMG may be read to have made a reasoned judgment, but also may be interpreted to have intentionally accepted the audit opinion without confirming whether the basis for the specialist's objections were valid. The allegations, along with KPMG's arguments, support the notion that the issuance of the audit opinion without complete resolution of the objection was a knowing decision. As opposed to KPMG's suggestion of a reasoned judgment, Plaintiffs offer an equally compelling inference of a deliberate choice not to verify the merits of the specialist's objections, which appears to have been valid.

#### d. *ALL*

█ Based on the Court's earlier discussion of the ALL allegations, the Court concludes that the allegations do not support a claim of scienter where the ALL did not inflate earnings nor misrepresent New Century's financial health in a positive light.

#### e. *Mortgage Servicing Rights and Goodwill*

As with other areas already discussed, the Complaint suggests that KPMG internal specialists recommended an independent valuation of the mortgage servicing rights, but the audit team did not do so, despite the fact that New Century had not conducted a proper valuation of those rights. (Compl. ¶ 233.) Again, this allegation supports a strong inference of a delib-

erate willingness to state that there was GAAP compliance when there clearly was not. (*See id.*) As for goodwill testing, the Examiner found that KPMG simply failed to obtain the necessary evidence to even audit the testing. (*Id.*) At this stage and in the context of strong inferences of scienter on several grounds, the Court also finds that Plaintiffs have adequately alleged a strong inference with respect to goodwill.

### f. *Summary*

The Court concludes that Plaintiffs have stated particularized facts that give rise to a strong inference of scienter as to KPMG's alleged misrepresentations in the 2005 audit opinion. The only exception at this stage are statements regarding the ALL. The Court notes that Plaintiffs have linked the allegations regarding KPMG's knowledge of internal control deficiencies with the allegations of misrepresentations. Moreover, the allegations regarding inadequate and inexperienced staff, and the rapid discovery of the alleged accounting violations are further support for the several strong inferences that KPMG's audit contained deliberately reckless misstatements regarding New Century's accounting practices.

### 3. *Loss Causation*

 A plaintiff in a § 10(b) case must also plead loss causation. As the Supreme Court explained the plaintiff's pleading burden in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), a plaintiff must provide allegations of loss causation that show investors paid an artificially inflated price for stock and that the stock price fell "after the truth became known" regarding the defendant's material misrepresentations. 544 U.S. at 344, 125 S.Ct. 1627. A plaintiff satisfies this pleading requirement by alleging "some indication of the loss and the causal connection plaintiff has in mind."

*Daou*, 411 F.3d at 1026; *see Dura*, 544 U.S. at 347, 125 S.Ct. 1627 (suggesting that Rule 8(a)(2) notice pleading applies and noting that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."). In raising the affirmative defense of "negative causation," a defendant asserts that the alleged misrepresentation did not cause a plaintiff's damages. *See* 15 U.S.C. § 77k(e).

KPMG argues that *Dura* requires Plaintiffs to plead a fact-for-fact corrective disclosure to sufficiently allege loss causation. The law does not clearly support this interpretation. As stated by one court, the Supreme Court in *Dura* "did not ... indicate what form a disclosure must take, how completely it should reveal previously misrepresented or concealed information, or how specifically it must refer to that information." *In re Motorola Sec. Litig.*, 505 F.Supp.2d 501, 540 (N.D.Ill.2007). Rather, Plaintiffs must plead facts giving rise to a reasonable inference that the market became aware of the misrepresentations. *Corinthian*, 540 F.3d at 1064. The truth need not be revealed to the market through a single, complete disclosure. *See Daou*, 411 F.3d at 1026–27; *accord Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C.2006)("[R]eading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."). Courts have cast doubt, however, on whether the announcement of an investigation can be sufficient as a matter of law to plead loss causation. *See Hansen*, 527 F.Supp.2d at 1162 (suggesting that a disclosure of wrongdoing is required); *Weiss*, 527 F.Supp.2d at 945–48 (only announcement was a voluntary inves-

tigation that did not disclose any facts to the market).

■■■ Here, Plaintiffs allege that KPMG's statements in its audit opinion caused their damages. KPMG raises the "negative causation" defense. It argues that the chain of events leading to the decline of Plaintiffs' stock did not implicate disclosure of any misstatements by KPMG. Specifically, the only relevant KPMG representations occurred in its 2005 audit opinion concerning New Century's 2005 financial statements; the February 7, 2007 disclosures concerned the 2006 financial statements for which KPMG did not provide an audit opinion; the March 2, 2007 disclosures did not clearly correct a KPMG statement; and thus, the decline in Plaintiffs' stock was the result of disclosures related to financial statements that were not reviewed by KPMG. Therefore, KPMG argues, Plaintiffs cannot plead loss causation as a matter of law.

Plaintiffs do not argue that the February 7, 2007 disclosures concerned KPMG's statements.[26] However, Plaintiffs argue, and plead, that additional disclosures on March 2, 2007 concerned KPMG's opinion regarding the 2005 financial statements. On that date, New Century announced that the Audit Committee of the Board of Directors had "initiated its own independent investigation into the issues giving rise to the Company's need to restate its 2006 interim financial statements, as well as issues pertaining to the Company's val-uation of residual interests in securitizations in 2006 *and prior periods.*" (Compl.¶ 464.) Plaintiffs emphasize that this reference to "prior periods" can be read to refer to the 2005 financial statements reviewed by KPMG. Also, Plaintiffs explain that this Audit Committee decision followed a February 2007 report by KPMG to the Committee. Since the most significant decline in stock price occurred after the March 2, 2007 disclosures, Plaintiffs maintain that they have sufficiently pled loss causation.

The Court finds that Plaintiffs have sufficiently pled loss causation. The March 2, 2007 disclosure indicates the need to re-evaluate at least certain financial statements in "prior periods." This includes the 2005 financial statements reviewed by KPMG. As a significant stock decline followed this disclosure, Plaintiffs have properly alleged loss causation. KPMG frames the reference to "prior periods" as merely a two-word passing reference to an investigation. (KPMG's Mot. at 12.) Plaintiffs' allegations suggest, however, that the import of the reference to "prior periods" was not so limited, particularly in the context of the other disclosures. Unlike the disclosure of an investigation in *Weiss,* for example, the disclosure of New Century's investigation into prior periods was made in the context of other information about New Century's financial state. (Compl.¶¶ 458–65.) *See Weiss,* 527 F.Supp.2d at 947.[27] Plaintiffs appear to

---

**26.** KPMG cannot be liable for losses that occurred prior to disclosures that implicated its misrepresentations. *See Daou,* 411 F.3d at 1026–27.

**27.** The Court considers the allegations here to be distinct from those the Ninth Circuit found inadequate in *Corinthian.* In *Corinthian,* the court was troubled by the suggestion that the market could become aware through (1) the announcement of a location-specific investigation and (2) a company-issued "euphemism."

540 F.3d at 1063–64. The plaintiffs had argued that the disclosure that there would be "higher than anticipated attrition" was a "euphemism" for an admission of the company's broad alleged fraud. *Id.* at 1064. In this case, however, the disclosures that allegedly caused the drop in stock price were significantly more detailed in suggesting how previous statements were problematic than simply a suggestion that revenue might be lower than anticipated.

allege that the relationship between the disclosed problems with the 2006 statements and the 2005 misstatements were integrally overlapping such that they had become known to the market. Admittedly, the connection between the March 2, 2007 disclosure and KPMG's allegedly misleading statements may be found too attenuated, or the existence of intervening causes may be too significant, for Plaintiffs to establish loss causation. Those are factual questions that this Court does not resolve on a 12(b)(6) motion. The Complaint sufficiently provides KPMG with an "indication of the loss and the causal connection that [Plaintiffs] [have] in mind." *Dura*, 544 U.S. at 347, 125 S.Ct. 1627. Thus, the Court considers Plaintiffs' allegations of loss causation adequate.

### G. *Plaintiffs' Claims Under Section 11 and Section 15 of the Securities Act*

Plaintiffs bring claims under Section 11 of the Securities Act against the Officer Defendants, Director Defendants, Defendant KPMG, and the Underwriter Defendants. Plaintiffs also bring claims under Section 15 of the Securities Act for control person liability against the Officer Defendants.

■■■ A defendant may be liable for violations of Section 11 for innocent or negligent misstatements or omissions of material fact in a securities registration statement. 15 U.S.C. § 77k(a). Those against whom a plaintiff may bring a Section 11 claim include but are not limited to "every person who signed the registration statement," "every person who was a director ... of the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted," "any person ... [who has] prepared or certified any report or valuation which is used in connection with the registration statement," and "every un-

derwriter with respect to such security." *Id.*

■■■ "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir.1996) (citation and internal quotations omitted). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *Id.* (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

■■■ Although a plaintiff need not plead loss causation in a § 11 claim, negative causation is an affirmative defense. *See* 15 U.S.C. § 77k(e). A court may dismiss a complaint for lack of causation if the affirmative defense is apparent from the face of the pleading. *See McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir.1990) (quoting 5A C. Wright & A. Miller, Federal Practice and Procedure § 1357 (2d ed.1990)). In raising the affirmative defense of negative causation, "the defendant has a heavy burden of proving that the decline in stock price was caused by factors other than the misstatement(s) in the registration statement." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F.Supp.2d 377, 383 (S.D.N.Y.2006) (internal quotation marks omitted).

#### 1. *Section 11 and Control Person Liability Claims Related to Series A Stock*

The Underwriter Defendants and the Director Defendants challenge the Section 11 and control person liability claims related to the Series A preferred stock. New Century sold its Series A preferred stock

in June 2005, for approximately $109 million. (Compl.¶ 236.) The Underwriter Defendants and Director Defendants argue that the Complaint (1) fails to sufficiently allege material misstatements or omissions and (2) discloses on its face the affirmative defense of negative causation.

### a. Material Misstatements or Omissions

The Court's discussion of Plaintiffs' allegations of false and misleading statements, *supra* Part II.E.1, is fully applicable to the Section 11 claims. The Court determined that the Complaint adequately alleges false and misleading statements with respect to financial accounting, internal controls, and loan quality and underwriting. The Court also determined that exceptions from liability for "forward-looking statements" and "mere puffery" cannot be found to conclusively apply based on the particular circumstances alleged in the pleadings. The Complaint alleges Section 11 claims in connection with the Series A stock against the Officer Defendants, Director Defendants, and Underwriter Defendants. These are appropriate defendants under 15 U.S.C. § 77k(a). The false and misleading statements for the Section 11 claim are largely the same as those alleged in Plaintiffs' Section 10(b) claims. The Court therefore finds that the Complaint supports reasonable inferences of material false and misleading statements.

### b. Loss Causation

The Underwriter Defendants and the Director Defendants argue that the alleged misstatements regarding the Series A stock did not cause Plaintiffs to suffer a loss, and thus the Court should dismiss the Section 11 claim with respect to Series A stock. Specifically, the Underwriter Defendants and Director Defendants emphasize that the disclosures between February 7, 2007 and March 13, 2007 "have nothing to do with the alleged misstatements in the Series A Registration Statement." (Underwriter Defs.' Mot. at 30.) The Court addressed this argument in connection with the claims against KPMG, and incorporates that analysis here. Notwithstanding any factual arguments regarding Plaintiffs inability to prove loss causation, Plaintiffs have sufficiently alleged loss causation to survive the pleading stage. The Section 11 claims regarding the Series A stock, and the derivative Section 15 claims against the Officer Defendants, may stand.

### 2. Section 11 and Control Person Liability Claims Related to Series B Stock

Additionally, the Underwriter Defendants and the Director Defendants challenge the allegations as to the Series B stock offering, issued in August 2006. Defendants' arguments focus on false and misleading statements rather than loss causation. The Court incorporates its earlier analysis of false and misleading statements, *supra* Part II.E.1. For the same reasons stated, Plaintiffs may proceed with their Section 11 claims regarding the Series B stock, and the derivative Section 15 claims against the Officer Defendants.

## III. CONCLUSION

For the foregoing reasons, the Court substantially DENIES Defendants' motions to dismiss and DENIES Defendant KPMG's motion to strike. The Court dismisses allegations of false and misleading statements that rely on the group pleading doctrine.

IT IS SO ORDERED.