**NPS LLC, Plaintiff,**

v.

**AMBAC ASSURANCE CORPORATION,**
Defendant.

Civil Action No. 08–11281–DPW.

United States District Court,
D. Massachusetts.

Feb. 25, 2010.

Daniel L. Goldberg, Charles L. Solomont, Samuel R. Rowley, Bingham McCutchen LLP, Boston, MA, for Plaintiff.

Carrie A. Syme, David W. Dykhouse, Nivritha Ketty, Philip R. Forlenza, Patterson Belknap Webb & Tyler LLP, New York, NY, Peter M. Acton, Edward P. Leibensperger, Thomas O. Bean, McDermott, Will & Emery LLP, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

The plaintiff, NPS LLC ("NPS"), an affiliate of the New England Patriots, issued bonds in 2000 to fund the construction of Gillette Stadium. NPS obtained financial guarantee insurance for the bonds through the defendant, Ambac Assurance Corporation ("Ambac"). In this diversity suit, NPS alleges that Ambac's communications regarding its credit rating, which was lowered in January 2008, constituted intentional misrepresentation, negligent misrepresentation and violations of Mass. Gen. Laws ch. 93A and that they

excuse any apparent breach of contract. Ambac counterclaims that NPS has, without excuse, breached the insurance agreement in refusing to pay the guaranteed premium due upon redemption of the bonds in 2008. Ambac moves for summary judgment as to all claims.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties' Agreement

In 2000, NPS issued $282 million in long-term bonds to finance the construction of Gillette Stadium, the home field of the New England Patriots. NPS entered into an agreement with Ambac, a financial guaranty insurer headquartered in New York, for the provision of financial guaranty insurance on the bonds.

In 2006, NPS refinanced the 2000 bonds, issuing new 30–year bonds and again obtaining financial guaranty insurance through Ambac. Under the 2006 insurance policy, Ambac was obligated to pay NPS bondholders the regularly scheduled principal or interest payments on the 2006 bonds if NPS failed to pay them. Ambac and NPS entered into the 2006 Insurance Agreement ("Agreement"), requiring NPS to pay Ambac annual premiums of 0.20 percent of the outstanding principal amount of the 2006 bonds, including an initial premium of $519,565 (covering the annual premiums from December 2006 to December 2008).

The Agreement also contained a provision for a Guaranteed Premium, which would be payable if NPS either paid the 2006 bonds in full or otherwise terminated the policy within the first ten years of the term. Section 1.02 of the Agreement provided:

> [I]f the [2006 Bonds] are paid in full or the Policy is terminated for any reason prior to January 1, 2017, [NPS] shall nevertheless pay to Ambac, upon such final payment date or termination date, the present value, using a discount rate of 7%, of each of the Annual Premiums scheduled to be paid from and including such date until January 1, 2017, pursuant to Section 1.02 hereof . . . .

The Agreement included a merger clause in Section 3.08, recognizing that the Agreement "constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior agreements and understandings of the parties hereto with respect to the subject matter hereof."

#### 2. Ambac's Credit Rating

Ambac receives a rating of creditworthiness from credit rating agencies, such as Standard & Poor's, Fitch, and Moody's; that rating is subject to periodic review. At the time of the 2006 Agreement, Ambac's credit rating was AAA, or Aaa, the highest possible rating from credit rating agencies.

When the 2006 Agreement was executed, Ambac's investment portfolio included derivatives and mortgage-backed derivatives. This information was disclosed in Ambac's 2005 Annual Report, which discussed the risk factors in Ambac's business, including the risk that its credit ratings "may be downgraded by one or more rating agencies." By 2007, the rapid decline in housing prices and the spread of mortgage defaults, especially defaults on the subprime mortgages that made up much of the mortgage-backed securities market, resulted in a major credit crisis. In December 2007 and January 2008, Standard & Poor's, Fitch, and Moody's placed a negative outlook warning on Ambac's credit rating. Within the next six months, each of the major credit rating agencies downgraded Ambac's credit rating.

NPS's bonds were "auction rate bonds," traded at an auction on a weekly or month-

ly basis. An auction "fails" if insufficient bidders appear for the bonds, leaving the bondholder without a buyer. In February 2008, NPS experienced a failed auction, after which the interest rate on the 2006 bonds increased to as high as 20 percent. NPS alleges that while the auction failure directly caused the increase in interest rates, the auction failure was itself triggered by the revision of Ambac's credit rating.

### 3. NPS's Redemption of the Bonds

On or about May 16, 2008, NPS decided to redeem the 2006 bonds in full. When Ambac informed NPS that the redemption of the 2006 bonds triggered the Guaranteed Premium clause in Section 1.02 of the Agreement, NPS responded that it would not pay the Guaranteed Premium. On July 2, 2008, Ambac sent NPS written notice that NPS was in default under the Agreement.

### B. Procedural History

NPS filed this law suit in Massachusetts state court and the case was removed to federal district court on diversity grounds. NPS alleges intentional or fraudulent misrepresentation (Count VI), negligent misrepresentation (Count VII), and violations of Mass. Gen. Laws ch. 93A (Count VIII). NPS also seeks various declaratory statements as to NPS's defenses to a breach of contract claim, namely that the Agreement was unenforceable (Counts I and V) and that any breach by NPS was excused (Counts II, III, and IV).[1] Ambac asserts a counterclaim for breach of contract as a result of NPS's failure to pay the Guaranteed Premium pursuant to Section 1.02 of the Agreement. Ambac moves for summary judgment as to its counterclaim, and as to all eight counts of NPS's Complaint.

Ambac, pursuant to Fed.R.Civ.P. 26(c), moved for a stay on all discovery pending the resolution of its motion for summary judgment. A court may grant a stay of discovery for "good cause shown," Fed.R.Civ.P. 26(c), as part of its "broad discretion in ruling on pre-trial management matters." *Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc.*, 425 F.3d 67, 73 (1st Cir.2005) (internal quotations omitted). Because Ambac's motion for summary judgment presents legal issues for which further discovery would likely not be necessary, I granted the motion to stay discovery and I now proceed to the summary judgment contentions before me.

### II. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues as to material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir.2009). The court must evaluate the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Rodriguez v. Suzuki Motor Corp.*, 570 F.3d 402, 404 (1st Cir.2009).

### III. ANALYSIS

Of NPS's eight counts, five involve requests for declarations on NPS's defenses to any purported breach of the Agreement. I will therefore initially discuss Ambac's

---

1. NPS requests the following declaratory statements: that the Agreement is unenforceable (Count I); that any breach by NPS is excused under the doctrine of frustration of purpose (Count II); that any breach by NPS is excused under the doctrine of impractica-
bility and impossibility (Count III); that any breach by NPS is excused because a condition of performance was not fulfilled (Count IV); and that Section 1.02 of the Agreement is an unenforceable penalty clause (Count V).

counterclaim for breach of contract and NPS's related claims regarding excuse and unenforceability (Counts I through V), before proceeding to NPS's affirmative claims (Counts VI through VIII). At the threshold I must determine what state law applies to each of these claims.

### A. Applicable State Law

■ The Agreement includes a provision specifying that the contract is governed by New York law. A federal court sitting in diversity evaluates contractual choice of law provisions according to the rules of the forum state, here Massachusetts. *Mariasch v. Gillette Co.*, 521 F.3d 68, 71 (1st Cir.2008).

#### 1. Breach and Excuses for Breach

■ In Massachusetts, a contract's choice of law provision is generally honored, provided that it does not conflict with public policy. *Feeney v. Dell Inc.*, 454 Mass. 192, 908 N.E.2d 753, 766 (2009). Such provisions govern the rights and duties of the parties under the agreement. *Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886, 888 (1982). Consequently, all questions regarding breach (Ambac's Counterclaim) and excuses for breach (NPS's Counts II, III and IV) will be decided under the law of contracts in New York.

#### 2. Enforceability

With respect to NPS's unenforceability claims (Counts I and V), the contractual choice of law provision is not binding. The First Circuit has held that claims about the validity of a contract's formation, unlike claims of an alleged breach, are not governed by a choice of law provision.

*Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 611 (1st Cir.1993) (finding a claim to fall outside a choice of law provision "[b]ecause this claim concerns the validity of the *formation* of the contract," and does not involve "the rights or obligations arising under the contract").

■ Because the Agreement's choice of law provision does not apply to the validity of the contract's formation, Massachusetts choice of law rules will directly determine which state's law does apply. Massachusetts has adopted a "functional choice-of-law approach," which focuses on "the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668 (1985). One guiding principle is the identification of that state which has "the most significant relationship to the transaction and the parties." *Id.* at 669 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1) (1971)).

Ambac has not disputed NPS's contention that Massachusetts law governs the common law claims.[2] And, indeed, I find that the appropriate choice of law in this context is that of Massachusetts. Although Ambac is headquartered in New York, this case involves a Massachusetts plaintiff—NPS—and financial guarantee insurance for bonds on a Massachusetts construction project undertaken by a Massachusetts corporation.

#### 3. Common Law Claims

■ Choice of law provisions will govern the tort actions that arise from a breach of contract if breach is an essential element

---

**2.** Ambac has not specifically objected to the application of Massachusetts law here, but instead argues that Massachusetts law and New York law are essentially alike on the relevant points at issue. Ambac purports to reserve its right to argue for the application of New York law if necessary, but given that the issues are presented on summary judgment and involve questions of state law, I will proceed with a choice of law analysis, notwithstanding Ambac's purported reservations.

of the tort claim. *See Northeast Data*, 986 F.2d at 609–10 (finding that when an agreement has established that one state's law governs contract-related claims, another state's law cannot then also govern "serious" or "rascal-like" breach of contract claims). NPS's tort claims, however, do not have breach of contract as an essential element, but instead involve Ambac's actions preceding contract formation. Under the functional choice of law framework adopted in Massachusetts, *Bushkin*, 473 N.E.2d at 668, I conclude that the appropriate choice of law here is that of Massachusetts for the reasons discussed with respect to the enforceability challenges.

### 4. Chapter 93A Claim

■ I conclude NPS may proceed with a Chapter 93A claim under Massachusetts law. If a contract is governed by a particular state's law under a choice of law provision, then a party cannot bring a claim under another state's statute if that statutory claim is "essentially duplicative" of a contract claim. *Northeast Data*, 986 F.2d at 610; *see also Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 548 N.E.2d 182, 188 (1990) (finding that a warranty's liability provision barred a Chapter 93A claim, which was merely "an alternate theory of recovery under the contract"). NPS's Chapter 93A claim, however, is not duplicative of a contract claim; NPS is challenging the circumstances underlying the formation of the contract, and is not alleging a breach of contract by another name.

## B. Breach of Contract

NPS does not directly challenge Ambac's allegation of breach, nor could it. NPS has indisputably failed to pay the

Guaranteed Premium subsequent to its redemption of the 2006 bonds. Rather, NPS challenges the enforceability of the Agreement generally and Section 1.02 in particular, and claims that its nonpayment should be excused.

### 1. Enforceability

As discussed in Section II.A.2., *supra*, I will consider the enforceability issues presented by Counts I and V in light of Massachusetts law.

#### a. Enforceability of the Agreement

NPS alleges that Ambac cannot enforce the 2006 Agreement because it induced NPS to enter into the Agreement through fraudulent and/or negligent misrepresentations regarding its credit rating and business practices. (Compl. ¶ 78).

##### (i) Fraud in the Inducement

■ Massachusetts law follows the Restatement's model for fraud in the inducement: "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." *Nash v. Trustees of Boston Univ.*, 946 F.2d 960, 967 (1st Cir.1991) (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 164 (1979)); *see also Cherry v. Crispin*, 346 Mass. 89, 190 N.E.2d 93, 95 (1963) ("One who has relied on a misrepresentation as to a material fact, intentionally made and knowingly false, is entitled to rescission of the disputed transaction.").

■ Intentional misrepresentation requires showing a false representation of a material fact, with knowledge of its falsity, made to induce the plaintiff to act on the representation, and reasonably relied upon as true.[3] *Twin Fires Inv., LLC v. Morgan*

---

**3.** Ambac devotes some attention to the lack of a "special relationship" between Ambac and NPS. This argument is not relevant here. First of all, the "special relationship" criterion applies only to negligent misrepresentation claims in New York, not Massachusetts. *Golber v. Baybank Valley Trust Co.*, 46 Mass.App. Ct. 256, 704 N.E.2d 1191, 1192 (1999); *Hudson River Club v. Consol. Edison Co.*, 275

*Stanley Dean Witter & Co.,* 445 Mass. 411, 837 N.E.2d 1121, 1134 (2005); *Rodi v. S. New Eng. Sch. of Law,* 389 F.3d 5, 13 (1st Cir.2004).

### (ii) The Alleged Misrepresentation

Although it is unclear at times from the parties' submissions which particular representations are challenged by the plaintiff,[4] NPS in its Opposition memorandum argues that its allegation is "that Ambac claimed—falsely—that it had not deviated from, and would maintain, the past underwriting practices that had enabled Ambac to uphold its AAA credit rating for so

many years." NPS refers to this as the "core" of the misrepresentations.

While a variety of statements are discussed at times by both parties,[5] the following statements are those that conceivably bear some relation to Ambac's alleged representation that it would not deviate from its past underwriting standards:

1. A 2006 Corporate Profile identified "The Financial Resources Backing Ambac's Guarantee," listing Ambac's features: Triple–A ratings; over $11 billion in claims-paying resources; a "high quality investment portfolio"; a "strong and diversified portfolio of guaranteed obligations";

---

A.D.2d 218, 712 N.Y.S.2d 104, 106 (2000). Second, only fraudulent misrepresentation, not negligent misrepresentation, can provide an excuse from performance. *Cherry v. Crispin,* 346 Mass. 89, 190 N.E.2d 93, 95 (1963).

**4.** Several statements by Ambac are identified in the Complaint, such as Ambac's statement that it had a "Triple–A Guarantee" and that Ambac's AAA credit rating would remain secure together with statements about Ambac's approach to underwriting and about its claims-paying resources. (Compl. ¶¶ 28–30, 33, 55). NPS highlights some of these statements in its briefs as relevant to the misrepresentation.

One commonly discussed statement is an Ambac executives' alleged statement that a lowering of Ambac's AAA rating was "never going to happen." (Compl. ¶ 55). NPS, however, asserts in its Opposition Memorandum that this mischaracterizes NPS's misrepresentation claim, and that "this case is not about whether Ambac knew that the rating agencies would downgrade its credit rating." This assertion, of course, is in some tension with NPS's statement that "[h]ere, the issue is not general 'reputation,' but specifically identifiable credit ratings." In any event, I address the core claims of misrepresentation as identified by NPS through its briefing.

**5.** After I raised questions at the hearing in this matter regarding the admissibility of the evidence provided in the Affidavit of Eileen M. Casey concerning alleged misrepresentations, NPS sought leave to append the sup-

plemental affidavit of Ms. Casey. The supplemental affidavit undertakes to remedy shortcomings in the asserted personal knowledge regarding misrepresentations as to which I, but not Ambac, raised issues. Rule 6(b) of the Federal Rules of Civil Procedure allows the court to extend a filing deadline "on motion ... if the party [has] failed to act because of excusable neglect." The decision "[w]hether to grant an extension rests largely in the discretion of the district court." *Local Union No. 12004, United Steelworkers Of America v. Massachusetts,* 377 F.3d 64, 72 (1st Cir.2004) (quoting 16A WRIGHT, MILLER, & COOPER, FEDERAL PRACTICE PROCEDURE § 3950.3 (3d ed. 2004)). Here, I find excusable neglect on the part of NPS, which did not encounter any objection to admissibility it might need to remedy until my comments at the hearing. Ambac itself never raised an objection. Any delay in submission did not prejudice Ambac, which itself raises no substantive objection to the supplemental affidavit. The four-paragraph supplemental affidavit merely clarifies the basis of Ms. Casey's knowledge of a few representations allegedly made by Ambac, and does not affect the substance of NPS's argument. In keeping with my general practice of attempting to reach the merits of a dispute and to avoid disposing of a case on technical-but remediable-procedural or evidentiary shortcomings, I will allow the motion to submit the supplemental affidavit. As will appear below, however, the supplemental affidavit does not affect the substantive outcome regarding the alleged misrepresentations.

and a "focus on comprehensive risk management." (Compl. ¶ 30 & Compl. Ex. A).

2. The Annual Report of Ambac Financial Group, Inc., Ambac's parent company, stated that its "[u]nderwriting guidelines, policies and procedures have been developed by Ambac Assurance's management with the intent that Ambac Assurance guarantees only those obligations which, in the opinion of Ambac Assurance underwriting officers, are of investment grade quality with a remote risk of loss." (Compl. ¶ 32; Spinelli Aff. Ex. 4 at 10).

3. Ambac executives allegedly stated that Ambac's business model was conservative compared to other bond insurers. (Compl. ¶ 55; Casey Aff. ¶ 36 & Supp. Casey Aff. ¶ 3).

4. Ambac executives allegedly represented to NPS that Ambac was following its time-tested business model of stringent underwriting practices, the same model that had secured Ambac a AAA rating since 1979.[6] (Compl. ¶¶ 54, 73; Casey Aff. ¶¶ 35–36 & Supp. Casey Aff. ¶ 3).

### *(iii) Analysis*

■■■■ As a general proposition, in Massachusetts "only statements of fact are actionable; statements of opinion cannot give rise to a deceit action." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 21 (1st Cir. 2001) (citing *McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass.App.Ct. 573, 650 N.E.2d 93, 96 (1995)); *see also Powell v. Rasmussen*, 355 Mass. 117, 243 N.E.2d 167, 168 (1969) (noting Massachusetts rule that statements of "opinion, estimate, or judgment" cannot give rise to an action for deceit). Statements of opinion and belief,

however, may be actionable if such an "opinion is inconsistent with facts known at the time they are made." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 809 N.E.2d 1017, 1030 n. 24 (2004) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 627 (1st Cir.1996)); *see also Cummings*, 244 F.3d at 22 (quoting *McEneaney*, 650 N.E.2d at 96) ("Even a statement that in form is one of opinion 'may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it.' "); *In re Smith & Wesson Holding Corp.*, 604 F.Supp.2d 332, 342 (D.Mass.2009) (finding to be actionable statements about "increasing demand").

■■■ Some company representations are "normal commercial puffing" and thus inactionable statements of opinion. *Cummings*, 244 F.3d at 21. When a company makes a "kind of general, rosy affirmation," these statements are puffery and "cannot have been material to any reasonable analysis of the company's prospects." *Orton v. Parametric Tech. Corp.*, 344 F.Supp.2d 290, 301 (D.Mass.2004); *see also Burke v. Conversent Commc'ns of Mass., Inc.*, 907 N.E.2d 265 (Table), 74 Mass.App. Ct. 1115, 1115 (2009) (concluding that a general statement that the company could provide better services than its competitor was "inactionable sales talk or puffery").[7] Nevertheless, the Supreme Judicial Court has suggested that corporate statements of opinion about risk are more likely to be actionable because they suggest knowledge

---

**6.** NPS *does not quote Ambac directly, and* cites no particular statement by Ambac as the source of this description.

**7.** NPS cites case law observing that dismissals on the grounds of puffery are increasingly rare. *See Brumbaugh v. Wave Sys. Corp.*, 416 F.Supp.2d 239, 250 n. 11 (D.Mass.2006).

While it is true that courts should consider these statements "carefully," *id.* at 250, Massachusetts courts have continued to find statements of opinion regarding the performance of a company not to be actionable. *See, e.g., Burke*, 907 N.E.2d 265 (Table), 74 Mass.App. Ct. 1115.

of specific facts. *Marram,* 809 N.E.2d at 1030 (citing *DeBruyne v. Equitable Life Assur. Soc'y,* 920 F.2d 457, 465–466 (7th Cir.1990) for the proposition that "allegations as to . . . risk and volatility . . . appear more likely to raise a genuine issue of fact as to misrepresentation"); *see also id.* at 1030–31 (citing *Miller v. New Am. High Income Fund,* 755 F.Supp. 1099, 1104–05 (D.Mass.1991)) (statements that "did not accurately reflect the investments that the [defendants] would be making," statements "about 'techniques' to reduce risk," and statements that led an investor to believe the fund would not invest in "a riskier segment of the market" form a sufficient basis for a securities law misrepresentation claim).

NPS maintains that Ambac represented to NPS that it would not depart from its traditional underwriting practices. The falsity of these statements lies in the fact that, according to NPS, Ambac departed drastically from its traditional underwriting practices. In particular, Ambac had begun to provide financial guarantee insurance on investments such as collateralized debt obligations whose underlying assets were residential mortgage-backed securities. (Compl. ¶ 6). NPS and Ambac dispute whether these alleged statements are sufficiently specific and factual in nature to constitute misrepresentations. Ambac asserts that they are mere corporate puffing. NPS claims that its allegation of misrepresentation "goes far beyond" the individual statements identified in the Complaint, and reaches representations regarding "particular underwriting standards."

Courts vary in their conclusions of just where the line between misrepresentation and puffery lies, and often the determination is highly fact-specific. Several courts have found company statements about business practices and corporate health to be statements of opinion. For example, the Second Circuit recently found that un-der New York law, statements that a company's risk management was "highly disciplined" and "designed to preserve the integrity of the risk management process" were "no more than 'puffery.'" *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 205–06 (2d Cir.2009) (interpreting the statements in a securities fraud context). These statements did not guarantee that the company's decisions would prevent losses in the company's approach to risk management. Similarly, in *In re Australia & New Zealand Banking Group Ltd.,* 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009), the court determined that the defendant's general statements about risk management were corporate puffery. Statements that "[m]anagement is committed to achieving a strong risk control, resulting in 'no surprises' and a distinctive risk management capability," *id.* at *8, and that "the Audit Committee maintains 'a robust process for ensuring prompt resolution of audit issues . . . . to ensure that any remedial action is undertaken promptly,'" *id.* at *11, were inactionable "generalized, rosy statements." *Id.* at *12. *See also Pyramid Holdings, Inc. v. Inverness Medical Innovations, Inc.,* 638 F.Supp.2d 120, 122 (D.Mass.2009) (finding to be inactionable puffery statements including "[a]n important element of our strategy is to reduce costs through the use of efficient high quality manufacturing operations" and "[w]e determine what we are willing to pay for each acquisition partially based on our expectation that we can cost effectively integrate the products and services of the acquired companies into our existing services"); *In re Huffy Corp.,* 577 F.Supp.2d 968, 1014 (S.D.Ohio 2008) (finding statement that product lines were experiencing "solid growth" to be inactionable puffery).

Other courts, however, have found somewhat similar representations to be action-

able. For example, in *In re New Century*, 588 F.Supp.2d 1206 (C.D.Cal.2008), the court held that the defendant mortgage lender's statements about its loan quality and underwriting practices were not puffery. The defendant's representations that it had "loans of 'higher credit quality,' 'improved underwriting controls and appraisal review process,' 'a strategy [of selecting borrowers with increasing credit scores],' 'strict underwriting and risk management disciplines,' and 'better credit quality,'" *id.* at 1225, made while it was allegedly engaging in risky loan origination practices were actionable securities law violations. Similarly, a financial services company's assertions that it relied upon its underwriting guidelines were misleading when the guidelines were "systematically disregarded." *In re Dynex Capital, Inc.*, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ("At some point, statements by a defendant that it 'generally' adheres to a particular policy become misleading when in fact there is no such policy or the policy is something else altogether."); *see also Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142, 1149–50, 1154–55 (S.D.Cal.2008) (finding company's representations that it was "focused more on credit quality than merely increasing the volume of loans it originated and that [its] underwriting procedures were better and more conservative than those of other[s]" despite "pervasive, widespread exceptions to the Company's underwriting policies" to be actionable material misstatements.). The Third Circuit has also found company statements concerning management and underwriting practices and the company's financial security to be actionable. *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir.1992). The defendant bank holding company had stated that its management practices were "conservative" and "cautious," its lending practices were "conservative," and its collateralization "adequate," even though it knew the opposite to be true. *Id.* at 282.

Here, of the statements that are alleged in the Complaint, some are simply not false (such as the statement that Ambac had over $11 billion in claims-paying resources). Others are general statements of opinion about the quality of services that Ambac would provide [8]: that Ambac maintained a "high quality investment portfolio," and a "strong and diversified portfolio of guaranteed obligations"; that Ambac had a "focus on comprehensive risk management"; and that Ambac's business model was conservative. These are representations of opinion because they either express only "the belief of the maker, without certainty, as to the existence of fact," or "his judgment as to quality, value, authenticity, or other matters of judgment." *Cummings*, 244 F.3d at 21 (quoting RESTATEMENT (SECOND) OF TORTS § 538A (1977)). There is no ascertainable standard by which to judge the truth of these statements. In other words, they are not "susceptible of actual knowledge." *Id.* at 22.

The only statements that approach the line separating fact and opinion are that Ambac guaranteed only those obligations that "are of investment grade quality with a remote risk of loss," and that Ambac was using its time-tested business model of stringent underwriting practices. The remoteness or immediacy of risk, or the stringency of a business practice, might be considered in some circumstances to be

---

8. The parties also discuss in their briefing Ambac's alleged statement that the AAA credit rating would never be reduced, and whether this statement amounted to a non-actionable statement of "prophecy," or of future events that could not be proven false at the time.

Although I am inclined to view any prediction about future credit ratings as non-actionable, I need not definitively resolve this issue because NPS has made clear that the prediction regarding Ambac's future credit rating is not what this case is about. *See* Note 4, *supra*.

verifiable facts. To support its argument that these statements are actionable, NPS highlights an assertion made in *Bergeron* that " '[w]hat might be innocuous "puffery" or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.' " *Bergeron v. Ridgewood Securities Corp.*, 610 F.Supp.2d 113, 135 (D.Mass.2009) (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989)). NPS asserts that Ambac made the representations to cause NPS to rely on them. Yet all commercial puffing and sales talk is, to some extent, intended to induce reliance. It is meant to entice potential customers to buy or potential shareholders to invest. The puffing crosses the line into misrepresentation when it is "an *integral* part of a representation of *material fact.*" *Id.* (emphasis added).

The facts of both *Casella* and *Bergeron* are helpful in illustrating this point. In *Casella*, 883 F.2d at 806–07, the Casellas bought shares in a limited partnership allegedly relying on three misrepresentations by the defendant seller: (1) that the investment was "an IRS approved tax shelter;" (2) that if they invested $41,000, they would receive an income tax credit greater than the investment; and (3) that they would receive a return on their investment because it was secure and "a sure thing." The defendant argued that its representation that the investment was a "sure thing" was inactionable puffery. The Ninth Circuit disagreed, finding the statement to be actionable because it "was coupled with, and served to emphasize, specific material misrepresentations of fact" about the investment's tax consequences. *Id.* at 808.

Similarly, in *Bergeron*, 610 F.Supp.2d 113, the puffery was just one in a series of false statements of fact aimed at inducing investment. The defendant investment company allegedly guaranteed a four percent return on investment (a far more specific, fact-based representation than those at issue here). *See id.* at 122. Further, the guaranteed interest payment statement was coupled with and meant to emphasize specific factual misrepresentations. For example, the company sent letters to investors confirming it was planning an initial public offering ("IPO") when it had not even evaluated the possibility of one. *Id.* at 125–26. It also repeatedly told investors it was actively working with an investment bank on the IPO when, in fact, the investment bank had generated no written work. *Id.* at 125.

Here, Ambac's alleged assertions about its "time-tested business model of stringent underwriting practices" and the "remote risk of loss" are not coupled with any specific statements of fact. While NPS argues that the statements are "specific and express representations about maintaining particular underwriting policies," they do not refer to any specific practices or guidelines. NPS does not identify the policies, upon which NPS relied, that Ambac allegedly promised it would not change. The alleged representations lack both the specificity and the tie to factual falsehoods that form the basis of liability in other cases. *See, e.g., In re Moody's Corp.*, 599 F.Supp.2d 493, 509 (S.D.N.Y.2009) (company's statements about its independence were not puffery because the company listed "specific steps [it] was taking to ensure its independence and ratings integrity"). Ambac's statements relating to risk management, diversification, and traditional methods of underwriting were "merely generalizations regarding [its] business practices," *ECA*, 553 F.3d at 206, too general and vague to be capable of being proven true or false. If the representations were attached to assurances about specific underwriting

guidelines, that is, if they were "an integral part of a representation of material fact," *Bergeron,* 610 F.Supp.2d at 135, they could have crossed the line from puffery to misrepresentation. But without more than is found in the record before me, NPS cannot show at trial with the requisite particularity statements upon which it could be said reasonably to have relied regarding whether Ambac's underwriting practices were "stringent" or departed from a "time-tested business model."

NPS cannot, as a matter of law, show that Ambac induced NPS to enter the Agreement through intentional misrepresentation that would render the Agreement unenforceable. Consequently, I will grant summary judgment to Ambac as to NPS's Count I.

*b. Section 1.02 as a Penalty Clause*

The next enforceability question is whether the Guaranteed Premium clause in Section 1.02 of the Agreement is an unenforceable penalty clause. The provision, according to NPS, is a liquidated damages clause that bears no reasonable relation to the amount of Ambac's probable loss in the event of a breach, and is therefore unenforceable.

 The threshold question here is whether the Guaranteed Premium provision is indeed a liquidated damages provision. Liquidated damages provisions specify, at the time of contract formation, a fixed sum as the parties' estimate of the extent of the injury that a breach of contract would cause. *Factory Realty Corp. v. Corbin–Holmes Shoe Co.,* 312 Mass. 325, 44 N.E.2d 671, 674 (1942). In *Factory Realty,* the defendant challenged a provision in an agreement for the lease and ultimate purchase of a factory, pursuant to which the defendant had the right to cancel the agreement after a certain period of time, but would have to transfer certain stock in the factory upon cancellation. *Id.* at 672–73. The Supreme Judicial Court

found that this provision was not a liquidated damages provision because the cancellation of the agreement "was not a breach of the contract by the defendant, but rather was the exercise of a right reserved to the defendant in accordance with its terms." *Id.* at 674.

 This case is very similar to *Factory Realty.* Nothing in the Agreement prevents NPS from terminating the Agreement at any time; the Agreement merely establishes the terms of termination. It is a reasonable means to adjust the relation of the parties when NPS chooses to pretermit provision of a predictable income stream to Ambac. Because NPS's redemption of its bonds and subsequent termination of the Agreement have nothing to do with a breach, Section 1.02 cannot be characterized as a liquidated damages provision.

 Even if Section 1.02 were somehow to be characterized a liquidated damages provision, it would not be unenforceable as a penalty. "Whether a liquidated damages provision in a contract is an unenforceable penalty is a question of law." *NPS, LLC v. Minihane,* 451 Mass. 417, 886 N.E.2d 670, 673 (2008). Assessing the enforceability of a liquidated damages provision involves two inquiries: whether at the time of contracting the actual damages from a breach were difficult to ascertain; and whether the liquidated damages sum is a "reasonable forecast of damages expected to occur in the event of a breach." *Id.* (quoting *Cummings Props., LLC v. Nat'l Commc'ns Corp.,* 449 Mass. 490, 869 N.E.2d 617, 620 (2007)); *see also Liberty Mut. Ins. Co. v. Greenwich Ins. Co.,* 417 F.3d 193, 199–200 n. 6 (1st Cir.2005). With respect to the second inquiry, if a contract's liquidated damages provision is "not so disproportionate to anticipated damages as to constitute a penalty," then it should be enforced.

*NPS, LLC,* 886 N.E.2d at 673 (quoting *TAL Fin. Corp. v. CSC Consulting, Inc.,* 446 Mass. 422, 844 N.E.2d 1085, 1093 (2006)). The reasonableness of the measure of damages, however, depends on the circumstances of the case, in particular those circumstances at the time of contract formation (not after the contract was breached). *NPS, LLC,* 886 N.E.2d at 673–74.

 Both inquires would be satisfied in this case. First, the actual damages from a breach (assuming that termination of the Agreement could be characterized as constituting a breach) would have been difficult to ascertain at the time of contract formation. It would have been unclear at what point NPS would terminate the Agreement, leaving it uncertain as to how many years of annual premiums would be unpaid at the time of termination. Second, the estimate of damages is a reasonable forecast of the unknown damages. Given that NPS could have terminated the Agreement any time between the first year and the thirtieth year of the thirty-year term of the 2006 Bonds, it was reasonable for the Agreement to require payment of annual premiums for the first third—or first ten years—of the term. This benefitted not only Ambac, but also NPS. If NPS terminated the Agreement any time prior to January 1, 2017, then its obligations under Section 1.02 would be less than the cost of paying premiums for the remainder of the policy term for the bonds. And of course, if NPS terminated the Agreement any time on or after January 1, 2017, then it would owe Ambac nothing.

Because NPS cannot show either that Section 1.02 is a liquidated damages provision or, if characterized as one, unenforceable as a penalty, I will grant Ambac's motion for summary judgment as to NPS's Count V.

### 2. NPS's Excuses from Performance

It is not disputed that if the Agreement is enforceable, NPS is in breach for failing to pay the Guaranteed Premium. But NPS identifies three excuses for its breach: frustration of purpose; impossibility or impracticability of performance; and that a necessary condition of the Agreement was not fulfilled by Ambac. The validity of these excuses is governed by New York law.

#### a. Frustration of Purpose

 NPS contends that the sole purpose of the Agreement was to procure Ambac's AAA rating for the 2006 Bonds, thereby assuring their marketability and reducing the interest costs borne by NPS. (Compl. ¶ 81). Frustration of purpose requires the showing of three elements: first, the frustrated purpose must have been a "principal purpose" of that party in entering the contract; second, the frustration must be "substantial"; and third, "the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1523 (S.D.N.Y.1989) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 cmt. a (1981)). Under the frustration of purpose doctrine, performance is possible, but the expected value of the performance has been destroyed. *Bank of Am. Nat'l Trust and Sav. Ass'n v. Envases Venezolanos, S.A.,* 740 F.Supp. 260, 266 (S.D.N.Y.1990).

Applying these principles to the case before me, NPS must show that obtaining the benefits of a AAA credit rating was NPS's "principal purpose" in entering the Agreement, and that the nonoccurrence of a reduction of Ambac's credit rating was a "basic assumption" on which the contract was made.

With respect to the first inquiry, NPS has not shown that the principal purpose of the Agreement was to benefit from Ambac's strong credit rating. The preamble of the Agreement, which takes up an entire page, makes no reference to Ambac's credit rating or NPS's intentions with respect to the benefits of this credit rating. Instead, the preamble states that "Ambac has issued a financial guaranty insurance policy with respect to the [2006 bonds] which insures the scheduled payments of principal of and interest on the [2006 bonds]." The language of the Agreement suggests that NPS's principal purpose in entering the Agreement was to obtain financial guaranty insurance for the 2006 bonds, thereby ensuring that the bondholders would still be paid in the event that NPS itself could not pay them.

NPS responds that the insurance itself was meaningless because NPS had the resources to pay its bondholders. To be sure, obtaining the credit enhancement that came with Ambac's financial guaranty was an advantage of entering the Agreement with this particular insurance company; references to Ambac's AAA credit rating are found in materials distributed to NPS before the contract formation. But characterizing the receipt of these benefits as a "principal" purpose of the Agreement runs counter to the contractual document itself as well as to the nature of the contractual relationship between the parties. The rules for frustration of purpose "do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it." *Bank of Am. Nat'l Trust,* 740 F.Supp. at 266 (internal quotations omitted).

With respect to the second inquiry, NPS cannot show that the non-occurrence of a reduction in Ambac's credit rating was a basic assumption on which the contract was based. A credit rating is determined by external institutions, not the rated agency. The rating itself is subject to periodic review. NPS was aware that these institutions could at some point alter their evaluation of the risks involved in Ambac's business model. Indeed, NPS itself notified prospective bondholders that a reduction in Ambac's credit rating was possible, stating: "There is no assurance that such ratings will continue for any given period of time or that they will not be revised downward or withdrawn entirely by such rating agencies if, in the judgment of such rating agencies, circumstances so warrant." While NPS may have selected Ambac as an insurer because of its strong credit rating history, and while NPS may have had reason to expect that the strong credit rating would continue, there is no indication that NPS's decision to enter the Agreement was or could reasonably have been premised on the basic assumption that Ambac's credit rating would not be reduced.

### b. Impossibility or Impracticability of Performance

The defense of impossibility has been severely circumscribed in New York law. "Generally . . . the excuse of impossibility of performance is limited to the destruction of the means of performance by an act of God, *Vis major,* or by law." *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37, 41 (1968). Financial difficulties or economic hardship that would arise from performance are not sufficient to excuse performance under this theory. *Id.*

The defense of impossibility is unavailable here. NPS is seeking an excuse from paying Ambac the premiums that are due. It is not impossible for NPS to make these payments. Where nothing but disinclination is preventing the non-performing par-

ty from honoring the contract, the more accurate label for the defense is frustration of purpose, not impossibility. In any event, neither excuse is available to NPS.

### c. Condition Not Fulfilled

NPS maintains that Ambac was obligated to maintain a stable AAA credit rating as a condition of NPS's obligation to perform under the Agreement. (Compl. ¶ 96). But the Agreement here contains no express condition that Ambac maintain its AAA credit rating for the duration of the Agreement. NPS's position is that this condition was an implied or constructive provision of the Agreement.

■■■■■ New York law permits courts to identify implied conditions in a contract where "the realities of the arrangement made between the parties" indicate the presence of such a condition. *April Prods., Inc. v. G. Schirmer, Inc.*, 308 N.Y. 366, 126 N.E.2d 283, 288 (1955). But courts must be cautious in implying such conditions. When interpreting the rights and obligations under a contract, "courts may not fashion a new contract under the guise of contract construction." *Slatt v. Slatt*, 64 N.Y.2d 966, 488 N.Y.S.2d 645, 477 N.E.2d 1099, 1100 (1985). This is particularly the case where the parties' intentions are "clearly and unambiguously set forth." *Id.*

The Agreement here is not only clear and unambiguous, but it also includes an integration clause specifying that the Agreement "constitutes the entire agreement between the parties." I find no grounds here to depart from the express and negotiated terms of the 2006 Agreement. Even if I were to permit the reading of implied conditions into this Agreement, NPS cannot show that the maintenance of a particular credit rating was part of the contract. While Ambac's

strong credit rating no doubt played a role in NPS's ultimate decision to secure Ambac's particular financial guaranty, such attractions and benefits do not amount to conditions of the Agreement. I will therefore grant the Ambac's motion for summary judgment as to NPS's Count IV.

### 3. Ambac's Counterclaim

Because the Agreement, including Section 1.02, was enforceable, and because NPS's excuses for its non-performance have no legal merit, Ambac has established as a matter of law that NPS is in breach of the Agreement for failing to pay the amount due under the Guaranteed Premium clause. I will therefore grant summary judgment as to Ambac's counterclaim for breach of contract.

## C. Intentional Misrepresentation

The relevant evidence regarding the NPS claim for intentional misrepresentation has been discussed in the context of NPS's challenge to the Agreement's enforceability, Part III.B.1., *supra.*[9] NPS cannot show as a matter of law that Ambac has engaged in intentional misrepresentation because none of Ambac's alleged statements are actionable false representations. I will therefore grant Ambac's motion as to NPS's Count VI.

## D. Negligent Misrepresentation

■■■■ A negligent misrepresentation claim requires showing that the defendant (1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions; (4) causing and resulting in pecuniary loss to those others; (5) by

---

9. The affirmative claim of intentional misrepresentation, like the plaintiff's challenge to the Agreement's enforceability on grounds of fraud in the inducement, is governed by Massachusetts law. My analysis of the misrepresentation allegation therefore applies equally to both claims.

their justifiable reliance upon the information; and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information. *Golber v. BayBank Valley Trust Co.*, 46 Mass.App.Ct. 256, 704 N.E.2d 1191, 1192 (1999) (internal quotations omitted). Massachusetts, unlike New York, does not require claims for negligent misrepresentation to include a showing of a "special relationship." *See Hudson River Club v. Consol. Edison Co.*, 275 A.D.2d 218, 712 N.Y.S.2d 104, 106 (2000).

██ The NPS claim of negligent misrepresentation fails as a matter of law for at least two reasons. First, NPS cannot show that Ambac supplied false information. For the reasons discussed in Part III.B.1., the evidence of record does not create a genuine issue regarding whether Ambac communicated false information regarding its credit rating and its underwriting practices. The alleged statements were too general and vague to be considered anything more than mere puffery about the quality of services that Ambac could provide.

Second, NPS cannot establish that it justifiably relied on Ambac's communications regarding its credit rating. These communications were generalizations about Ambac's business, and NPS had reason to know that the rating institutions could lower Ambac's credit rating at any time. This is buttressed by the Agreement's inclusion of an integration clause, which does not permit "judicial intrusion upon contractual relationships" in cases of mere negligent misrepresentation. *Sound Techniques, Inc. v. Hoffman*, 50 Mass.App. Ct. 425, 737 N.E.2d 920, 926 (2000) ("To ignore a merger clause and allow recovery for a negligent misrepresentation does little to promote honesty and fair dealing in business relationships."). The Supreme Judicial Court has noted that a merger clause generally bars a negligent misrep-

resentation claim "only after some record has been established on a motion for summary judgment or after a trial." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 809 N.E.2d 1017, 1031 (2004). Here, discovery has been limited, but the record has been established with respect to the communications between the parties and the agreement that was executed. The existence of the merger clause weighs against any arguments of reliance on the part of NPS.

I will grant the Ambac's motion for summary judgment as to the NPS's Count VII.

### E. Chapter 93A

The NPS claim under Chapter 93A is that Ambac's alleged fraudulent inducement and intentional and negligent misrepresentations constitute unfair and deceptive trade practices under Chapter 93A. Section 11 of Chapter 93A protects persons engaged in business from the use or employment of an "unfair method of competition or an unfair or deceptive act or practice." Mass. Gen. Laws ch. 93A § 11. "The statute does not define unfairness, recognizing that there is no limit to human inventiveness in this field." *Commonwealth v. Fremont Inv. & Loan*, 452 Mass. 733, 897 N.E.2d 548, 556 (2008) (internal citations omitted) (discussing unfairness under Mass. Gen. Laws ch. 93A § 2). Indeed, the statute in some cases "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." *Id.* (quoting *Kattar v. Demoulas*, 433 Mass. 1, 739 N.E.2d 246, 257 (2000)).

Here, however, NPS has alleged that the unfairness in Ambac's conduct lies in the misrepresentations that Ambac allegedly made to NPS in the discussions prior to the execution of the 2006 Agreement. I have already determined that NPS cannot show that Ambac made any actionable misrepresentations to NPS. I will therefore

grant Ambac's motion for summary judgment as to NPS's Count VIII.

## IV. CONCLUSION

For the foregoing reasons, I GRANT Ambac's motion for summary judgment as to NPS's Counts I through VIII, and as to the Ambac's counterclaim for breach of contract. (Docket No. 34). The parties shall submit a joint statement on or before March 12, 2010 as to the outstanding balance due Ambac under Section 1.02 of the agreement and such prejudgment interest as would be appropriate in the circumstances. After consideration of that statement, the Court will enter an appropriate judgment for Ambac.